No. 00-412

IN THE SUPREME COURT OF THE STATE OF MONTANA

2001 MT 102

THE MONTANA POWER COMPANY,

Petitioner and Respondent,

v.

MONTANA PUBLIC SERVICE COMMISSION,

Respondent and Appellant,

MONTANA CONSUMER COUNSEL,

Intervenor, and

LARGE CUSTOMER GROUP,

Intervenor and Appellant.

APPEAL FROM: District Court of the Second Judicial District,

In and for the County of Silver Bow,

The Honorable John W. Whelan, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Denise Peterson, Special Assistant Attorney General, Montana Public Service Commission, Helena, Montana (argued); Donald W. Quander, W. Scott Mitchell, Kyle A. Gray (argued), Holland & Hart, Billings, Montana (Large Customer Group); Robert A. Nelson (Montana Consumer Counsel)

For Respondent:

Patrick T. Fleming, Michael P. Manion (argued), Montana Power Company, Butte, Montana

For Amicus:

James D. Pembroke, Janice L. Lower, Duncan Weinberg Genzer & Pembroke, Washington, D.C. (Central Montana Electric Power Cooperative, Inc. and Big Horn County Electric Cooperative, Inc.)

Argued: May 3, 2001

Submitted: May 3, 2001

Decided: June 12, 2001

Filed:

_____

Clerk


Justice James C. Nelson delivered the Opinion of the Court.

¶1 The Montana Public Service Commission (Commission) and the Large Customer Group (LCG) appeal an Order entered by the Second Judicial District Court, Silver Bow County, in favor of Respondent Montana Power Company (MPC).

¶2 We reverse.

¶3 Collectively, the issues raised by the Appellants are summarized as follows:

1. Did the District Court err in determining that the Commission's interpretation of the Electric Utility Industry Restructuring and Customer Choice Act violates MPC's constitutional right to just compensation under either the federal or the Montana Constitution takings clause?

2. Did the District Court err in concluding that the Commission incorrectly interpreted the plain language of the Electric Utility Industry Restructuring and Customer Choice Act when it denied MPC's proposed "trackers" accounting method

for recovering transition costs?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 This case concerns the deregulation of electricity generating utilities in Montana under recent legislation.

¶5 Enacted in 1997, the legislation, under Title 69, Chapter 8, also known as the "Electric Utility Industry Restructuring and Customer Choice Act" (hereinafter the Act), requires utilities such as MPC to separate the generation, distribution, and transmission functions of their operations. In turn, the generation function must be deregulated, or exposed to competitive markets, whereas the functions of distribution and transmission will remain regulated by the Montana Public Service Commission.

¶6 The Commission, under the Act, is charged with administering this process of restructuring and deregulation. Thus, the Act requires utilities to file a deregulation "transition" plan with the Commission that comports with various deregulation requirements under the Act. In turn, the Commission must review and approve of the plan pursuant to the mandates under the Act, including issuing a final order "approving, modifying, or denying the transition plan."

¶7 One such requirement is that in order for a utility to recover "transition costs" it must include a proposal in its transition plan as provided under the Act. These transition costs, which may ultimately be recouped from consumers, represent "stranded" costs associated with complying with legislated deregulation that could not otherwise be recovered in the soon-to-be competitive electrical power generation market. Categories of transition costs under the Act include the "unmitigable" costs associated with qualifying facility contracts, energy supply-related regulatory assets and deferred charges that exist because of current regulatory practices, and costs related to public utility-owned generation and other power purchase contracts.

¶8 The Act does not guarantee utilities that all transition costs may be recovered. Rather, in order to garner approval from the Commission of these transition costs, utilities such as MPC must supply the Commission with an "affirmative showing" of these costs, and also show "reasonable mitigation." A proposal for transition cost recovery would invariably involve estimating some costs that have yet to accrue, and therefore remain uncertain.

¶9 In turn, in determining whether to approve, modify, or deny these proposed costs contained in a utility's transition plan, the Commission must look at whether they are "reasonably demonstrable," and must consider them as a whole on a "net basis" unless waived by the public utility, the Commission must conduct a hearing and then issue a final order, determining if and to what extent a utility's transition costs can be recovered.

¶10 In the matter at bar, such a final order has yet to materialize due to the dispute that arose over MPC's proposed transition costs. At issue here is the method MPC proposed to the Commission for demonstrating its transition costs.

¶11 Foreseeing imminent uncertainty in the costs of electricity, MPC proposed that a current estimation of some, but not all, transition costs be deferred, and "tracked"--in some instances for as long as the next 25 to 30 years--so that a more accurate figure could be determined in the future. Therefore, with regard to certain assets, in particular a number of "qualifying facility contracts," MPC in essence proposed to offer no estimation of any transition costs; instead, such costs would be determined and thereby recovered at a later time, most likely on an annual basis, subsequent to the Commission issuing its "final" order as required under the Act.

¶12 The Montana Consumer Counsel and the Large Customer Group received permission to intervene in this matter. Both disagreed with MPC's proposed use of "trackers," claiming that the method would require as many as 30 years of cost tracking, which did not comport with the imperative of finality for fixing transition costs under the Act. At the Commission's request the parties briefed the issue, along with the Montana Department of Environmental Quality, Big Sky Power, and Montana Energy Brokers.

¶13 On November 24, 1999, the Commission issued an Order, which determined that MPC's proposed "tracking" or "trackers" cost accounting system, which would adjust transition costs in the future as such costs accrued, rather than reaching a current estimated fixed sum, was not consistent with the requirements of the Act. The Commission therefore concluded that under its interpretation of the Act, MPC's transition costs must be reduced to a fixed, net amount in order to gain approval. The Commission ordered MPC to amend its transition plan to specifically identify and demonstrate all transition costs it sought to recover, and not to rely on a future tracking mechanism.

¶14 MPC filed a motion for reconsideration, which was denied by the Commission on January 26, 2000. MPC sought judicial review by the District Court on February 17, 2000.

MPC argued that the Commission improperly interpreted the Act to preclude the use of trackers in its transition cost plan. MPC further contended that use of the proposed tracking method, although not expressly provided for under the Act, was well within the discretion afforded the Commission by the Legislature. MPC requested that the District Court reverse the Commission's decision that disallowed MPC's proposed tracking method for determining transition costs and permanently enjoin the Commission from enforcing its interpretation of the Act.

¶15 The District Court, in its May 12, 2000 Order, concluded that MPC's "substantial rights have been prejudiced because of the Commission's interpretation of the Act to disallow trackers, in violation of constitutional and statutory provisions." The court ordered that the Commission "must allow MPC to incorporate tracking mechanisms in its transition plan proposal."

¶16 The court reasoned that the Commission's interpretation of the Act "has great potential for depriving MPC or Montana consumers of property, and as such, is in violation of our Constitution." The court also determined that there was "no clear provision in the Act disallowing trackers," and therefore "the use of trackers is allowed," under the Act.

¶17 The Commission and intervenor LCG appealed. Oral argument was heard by this Court on May 3, 2001.

## STANDARD OF REVIEW

¶18 When reviewing an agency decision, we apply the same standard as did the district court. *See Synek v. State Compensation Mut. Ins. Fund* (1995), 272 Mont. 246, 250, 900 P.2d 884, 886.

¶19 In this case, as expressed under § 69-8-202(4), MCA, the Commission must process a request for approval of a transition plan pursuant to the contested case procedures of the Montana Administrative Procedure Act, Title 2, Chapter 4, Part 6. The District Court was then required to follow the standard of review as set forth in the Montana Administrative Procedure Act, under § 2-4-704, MCA.

¶20 In turn, judicial review of an agency decision under the contested case statutes permits a court to reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are

"in violation of constitutional or statutory provisions." *See* § 2-4-704(2)(a)(i), MCA. Here, the District Court applied (a)(i), in determining that "MPC's substantial rights have been prejudiced because of the Commission's interpretation of the Act to disallow trackers, in violation of constitutional and statutory provisions."

¶21 Accordingly, we must review the Commission's interpretation of the Act, as well as the District Court's conclusions of law, to determine if they are correct.

## DISCUSSION

¶22 As a preliminary matter, it is necessary to discuss certain underlying rules critical to the following analysis of the issues raised.

¶23 The District Court set forth a general rule, which is not disputed by the parties here, that "because of the expertise the Commission has in the area it administers, the interpretation of statutes administrated by the Commission is given great deference by the Court." The court then cited to this Court's decision in *D'Ewart v. Neibauer* (1987), 228 Mont. 335, 742 P.2d 1015. In *D'Ewart*, this Court stated that "the construction of a statute by the person or agency responsible for its execution should be followed unless there are compelling indications that the construction is wrong." *D'Ewart*, 228 Mont. at 340, 742 P.2d at 1018 (citation omitted). *See also, accord, Montana Consumer Counsel v. Public Serv. Comm'n* (1975), 168 Mont. 180, 187, 541 P.2d 770, 774, *and compare with Johansen v. State*, 1999 MT 187, ¶ 9, 295 Mont. 339, ¶ 9, 983 P.2d 962, ¶ 9 (stating that court should defer to an agency's *decision* where substantial agency expertise is involved).

¶24 Once this rule is properly traced to its source, however, it is necessary to temper the District Court's as well as the Appellants' slight but significant overstatement of its breadth. In *Bartels v. Miles City* (1965), 145 Mont. 116, 122, 399 P.2d 768, 771, this Court, in espousing the foregoing rule, provided several caveats that have since been shed through the ordinary course of repetitive citation that has brought us to the present. We stated that it is a well-accepted rule of statutory construction that the long and continued contemporaneous and practical interpretation of a statute by the executive officers charged with its administration and enforcement constitutes an "invaluable aid in determining the meaning of a doubtful statute." *Bartels*, 145 Mont. at 122, 399 P.2d at 771. We also stated that where such an interpretation "has stood unchallenged for a considerable length of time it will be regarded as a great importance in arriving at the proper construction of a statute." *Bartels*, 145 Mont. at 122, 399 P.2d at 771. We analogized this "deference" to an agency

or officer's interpretation of a statute to estoppel, due to the reliance by the "public and those having an interest in the interpretation of the law." *Bartels*, 145 Mont. at 122, 399 P.2d at 771.

¶25 Thus, the foregoing rule of deference applies, generally speaking, where the particular meaning of a statute has been placed in doubt, and where a particular meaning has been ascribed to a statute by an agency through a long and continued course of consistent interpretation, resulting in an identifiable reliance. Even then, such administrative interpretations are not binding on the courts; rather, they are entitled to "respectful consideration." *Doe v. Colburg* (1976), 171 Mont. 97, 100, 555 P.2d 753, 754. Accordingly, the test of time and reliance may nevertheless yield to a judicial determination that construction is nevertheless wrong, based on "compelling indications." *D'Ewart*, 228 Mont. at 340, 742 P.2d at 1018.

¶26 Here, the District Court determined, and the parties do not contest, that the Act, when read as a whole, is not ambiguous. Accordingly, if the statutory language is clear and unambiguous, the statute speaks for itself and there is nothing left for this Court to construe. *See In re Raymond W. George Trust*, 1999 MT 223, ¶ 19, 296 Mont. 56, ¶ 19, 986 P.2d 427, ¶ 19. Further, we must follow the ubiquitous rule, under § 1-2-101, MCA, that it is the obligation of the reviewing court, in interpreting a statute or an Act of legislation, to simply ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. *See Farmers Alliance Mut. Ins. Co. v. Holeman* (1996), 278 Mont. 274, 277, 924 P.2d 1315, 1317.

¶27 In sum, the Commission's interpretation of the Act, which is at issue here, requires no "deference" per se. However practical the Commission's construction of the Act may appear, the Act as a whole, or in particular, certainly has not been subjected to any meaningful "long and continued contemporaneous" interpretation. Thus, the Commission's interpretation that MPC's proposed transition cost tracking method does not comport with the Act--a decision intended to remove all doubt--has simply not "stood unchallenged for a considerable length of time" and, obviously, has not been relied on by MPC or any other party "having an interest in the interpretation of the law." Thus, consistent with our aforementioned standard of review, we shall focus our discussion and analysis on whether the Commission's interpretation of the Act was correct as a matter of law.

¶28 With the foregoing in mind, we turn to the issues presented by Appellants.

## *Issue 1.*

*Did the District Court err in determining that the Commission's interpretation of the Electric Utility Industry Restructuring and Customer Choice Act violates MPC's constitutional right to just compensation under either the federal or the Montana Constitution takings clause?*

¶29 The District Court, in its May 12, 2000 Order, concluded that it would "not interpret a statute in such a manner that it allows for an unlawful, or unconstitutional taking." Therefore, the court concluded that the "great *potential* for depriving MPC . . . of property . . . is in violation of our Constitution." (Emphasis added).

¶30 The Commission and LCG contend that the constitutional "takings" issue is not ripe for adjudication because MPC has yet to be deprived of any property, and any future loss at this point is speculative. The Appellants argue, therefore, that the District Court erred as a matter of law in determining that the Commission's interpretation of the Act violated either the Fourteenth Amendment of the Federal Constitution, or Article II, Sections 17 and 29, of the Montana Constitution.

¶31 We agree, and therefore will not entertain at this time the underlying merits of whether alleged State infringement upon a utility's transition cost recovery permitted under the Act may give rise to a constitutional takings claim.

¶32 The ripeness doctrine raised by the Appellants is a principle of law, grounded in the federal constitution as well as in judicial prudence, that requires an actual, present controversy, and therefore a court will not act when the legal issue raised is only hypothetical or the existence of a controversy merely speculative. *See Pearson v. Virginia City Ranches Ass'n*, 2000 MT 12, ¶ 30, 298 Mont. 52, ¶ 30, 993 P.2d 688, ¶ 30; *Portman v. County of Santa Clara* (9th Cir. 1993), 995 F.2d 898, 902-903 (stating that the basic rationale of the ripeness requirement is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements) (citations and internal quotations omitted).

¶33 In response to the foregoing, MPC sets forth the rule of statutory interpretation that "it is paramount that we give such construction to the statute as will preserve the constitutional rights of the parties." *See In re A.R.A.* (1996), 277 Mont. 66, 70, 919 P.2d 388, 391 (citing *LaFountaine v. State Farm Mut. Auto. Ins.* (1985), 215 Mont. 402, 406-

407, 698 P.2d 410, 413). MPC contends that because the Commission, as a State agency, established fixed rates for qualified facility contracts, MPC must in the future buy power from these facilities and then, perhaps, be forced to sell the power for far below the Commission's approved transition cost estimates. Without the accuracy of its proposed tracking system-- which MPC argues the Commission rejected as a result of incorrectly interpreting the Act-- its constitutional rights will be violated. Accordingly, MPC contends that the District Court did not err in staving off the "very likely" deprivation of its property at the hands of State action, in construing the Act contrary to the Commission's interpretation.

¶34 Our decision in *In re A.R.A.* involved the harm to the fundamental rights suffered by a parent in a custody dispute where the natural father was denied custody in favor of a stepfather, following the death of the natural mother. *See In re A.R.A.*, 277 Mont. at 68-70, 919 P.2d at 389-91. The constitutional rights at issue in *LaFountaine* were "trial by jury, proof beyond a reasonable doubt, the presumption of innocence, and all other rights guaranteed a criminal defendant" where an attorney stood accused of committing "deceit or collusion" which we concluded was, potentially, a criminal as well as a civil matter. *See LaFountaine*, 215 Mont. at 406-407, 698 P.2d at 413. In *LaFountaine*, we relied on *Mackin v. State* (1980), 190 Mont. 363, 369-70, 621 P.2d 477, 481. The constitutional rights at issue there involved State immunity from suit, under Article II, Section 18, of the Montana Constitution, where a mother of an injured youth brought a tort claim against the State, and was denied full recovery pursuant to a statute that limited the State's liability. *See Mackin*, 190 Mont. at 370, 621 P.2d at 481 (stating that neither "statutory nor constitutional construction by us should lead to absurd results if reasonable construction will avoid it"). The *Mackin* Court, in turn, extracted the foregoing rule from *Yurkovich v. Industrial Accident Board* (1957), 132 Mont. 77, 314 P.2d 866. In *Yurkovich*, this Court addressed the Worker's Compensation statutes, where a plaintiff coal miner had been injured on the job after a four-hundred-pound slab of rock fell onto the plaintiff and injured his spine. The Industrial Accident Board denied his claim of disability because he missed a 12-month deadline. We affirmed the District Court's decision which overturned the Board's denial, concluding that "the Board's first duty is to administer the act so as to give the employee the greatest possible protection within the purposes of the act." *Yurkovich*, 132 Mont. at 83, 314 P.2d at 870.

¶35 In all four decisions, this Court declared that it was, indeed, paramount that we give such construction to the statute placed at issue that would preserve the constitutional rights of the parties. *See*, *e.g.*, *In re A.R.A.*, 277 Mont. at 71, 919 P.2d at 391 (stating that "the

state's ability to intrude upon the parent/child relationship must be guarded"); *Yurkovich*, 132 Mont. at 83-85, 314 P.2d at 870-71 (stating that the act was fundamental legislation enacted first for the protection and benefit of the injured workman, his wife and children, and other dependants, and therefore must be liberally construed).

¶36 Applied to the matter at bar, it is clear that MPC's claim to an unconstitutional takings at the hands of the Commission's ruling on the proposed tracking mechanism is as hypothetical and speculative as the future of electricity costs in Montana themselves.

¶37 The District Court's Order, which seems bent on nipping this "potential" takings in the bud, expresses this inherent uncertainty by restating the Commission's contention that *if* the transition cost estimates prove to be too low, MPC *may* recover their inexact future market values by bringing a takings without just compensation claim. MPC's argument is similar: "unless trackers are deemed permissible, MPC *very likely will* be deprived of constitutionally protected property rights through a taking without adequate compensation." (Emphasis added). MPC further acknowledges that under seven of the qualifying facility contracts at issue, "no one will know how much customers or MPC [will be] actually harmed until this 25-year period has expired."

¶38 This is precisely the point. The State action--that is, the Commission's disallowance of MPC's proposed transition cost recovery method in its transition plan--has yet to deprive MPC of any property. Whether such "property"--assuming it is in fact property-- *very likely will* or *very likely will not* come into existence in one year or 25 years is anyone's guess at this point. The *very likely potential* of an unconstitutional takings claimed by MPC is thus distinguishable from those imminent and very real violations of constitutional rights and remedies at risk under *Yurkovich* and its progeny. In sum, we cannot interpret an act of legislation and thereby enjoin state action to preserve a property interest which does not, and may not, exist.

¶39 Therefore, we hold that the District Court erred when it declared, pursuant to its standard of review under § 2-4-704(2)(a)(i), MCA, that the Commission's interpretation of the Act produced an unconstitutional taking which has prejudiced MPC's "substantial rights."

## *Issue 2.*

*Did the District Court err in concluding that the Commission incorrectly interpreted the*

*plain language of the Electric Utility Industry Restructuring and Customer Choice Act when it denied MPC's proposed "trackers" accounting method for recovering transition costs?*

¶40 With no constitutional takings at issue, we turn to the Commission's interpretation of the Act, which the District Court concluded violated the plain language of the statutes at issue and thereby prejudiced the substantial rights of MPC.

¶41 In order to affirm the decision of the District Court, this Court must likewise conclude that the Commission violated statutory provisions in its interpretation of the Act, pursuant to § 2-4-704, MCA. *See* § 2-4-711, MCA; § 69-3-405, MCA; *Synek*, 272 Mont. at 250, 900 P.2d at 886.

¶42 The District Court determined that the plain language of the Act "allows tracking, in conjunction with, and not to the exclusion of (i), (ii) or (iii) sub parts of § 69-8-211(2)(b), MCA." Further, the court determined that "[t]rackers can be used and still achieve a net cost" as required under the Act, and there is "no clear provision in the Act disallowing trackers."

¶43 MPC, in turn, directs this Court to the Act's statement of policy, which declares that "the interests of Montana consumers should be protected and the financial integrity of electrical utilities should be fostered." *See* § 69-8-102(3), MCA. MPC argues that to construe the Act, as the Commission has, and disallow its proposed "trackers" accounting system for recovering future transition costs, could potentially harm both interests identified under the foregoing policy if transition cost estimates are either too low or too high. MPC contends, therefore, that the Legislature surely wished to encourage the full recovery of transition costs, because in the end, either the consumers or the electrical utilities will benefit.

¶44 The Commission and the LCG argue that it is the need for certainty and finality now--not 20 or 30 years from now--that is the gravamen of the Act's treatment of transition cost recovery. Accordingly, the Appellants contend that leaving some but not all transition costs undetermined under a "final" order would frustrate the plain intent of the Act that seeks a "settlement" of all transition costs claimed by a utility.

¶45 Furthermore, according to authority relied on by the Appellants, the concept of burdening the consumers in a deregulated market with "transition costs" is, of course, at

odds with the underlying principle of deregulation--that the infusion of competition will naturally select and reward the strongest and fittest utilities for the ultimate benefit of the consumer. In other words, the recovery of transition costs amounts, in part, to legislatively sanctioned public relief for anticipated losses among utilities and their shareholders. According to the Appellants, the Legislature recognized this by requiring utilities to mitigate and then estimate transition costs, so that a net sum could then be approved by the Commission in a final order that in turn lends an element of predictability to consumer choices in a deregulated market.

¶46 With the foregoing policy dispute in mind, we observe that the Commission is statutorily charged with applying and enforcing the Act, including the approval and ultimate determination of transition costs. *See* § 69-3-102, MCA (Commission is invested with full power of supervision, regulation, and control of public utilities); § 69-8-202(5), MCA (on approval of a transition plan, the Commission "shall enforce the public utility obligations as incorporated in the plan and in the Commission's final order"); § 69-8-403 (11), MCA (commission may promulgate "any other rules" necessary to carry out the provision of this chapter).

¶47 Accordingly, there are numerous provisions provided by the Legislature where the Commission may exercise its authority. Under § 69-8-211(2), MCA, for example, the Legislature has provided that the costs must be "determined" by the Commission upon an "affirmative showing" by a public utility. Under § 69-8-211(3), MCA, the Legislature has provided that the "amount" of a public utility's transition costs may be recovered, but only upon "approval" by the Commission. Finally, the Legislature requires that the Commission's approval of transition costs and the subsequent collection of those transition costs through transition charges must constitute a "settlement of all transition costs claims by a public utility" under § 69-8-211(5), MCA. Thus, the Legislature has also provided that a public utility "seeking to recover transition costs through any means not authorized by this chapter may not collect transition charges with respect to these transition costs," under § 69-8-211(5), MCA.

¶48 In exercising its power to determine and approve a utility's transition costs, the Commission must follow certain criteria set forth by the Legislature in the Act. First, by definition, a "transition cost" means only the "net verifiable generation-related and electricity supply costs, including costs of capital, that become unrecoverable as a result of the implementation of the Act or of federal law requiring retail open access or customer choice." *See* § 69-8-103(30), MCA.

¶49 Next, under § 69-8-202(1), MCA, all public utilities must submit a transition plan to the Commission, which demonstrates that the public utility "meets all the requirements of this chapter." The Commission must then, in accordance with § 69-8-202(4), MCA, "process a request for approval of a transition plan pursuant to the contested case procedures of the Montana Administrative Procedure Act," codified under Title 2, Chapter 4, Part 6.

¶50 Furthermore, in order to meet with the Commission's approval, transition costs submitted by a public utility must meet the requirements under § 69-8-211(2), MCA. Proposed transition costs must reflect "all reasonable mitigation" by the public utility, the value of all generation-related assets and liabilities and electricity supply costs must be "reasonably demonstrable," and, finally, these values and costs must be considered on a "net basis." *See* § 69-8-211(2), MCA.

¶51 Upon this "showing" by a utility, the Commission must then determine the value of a utility's proposed costs by using at least one of the following methods: (i) estimating future market values of electricity and ancillary services provided by the assets; (ii) appraisal by independent third-party professionals; or (iii) a competitive bid sale. The Legislature has also provided that the Commission, in addition to using at least one of the foregoing methods, may use other methods as well. *See* § 69-8-211(2)(b), MCA. Here, it is undisputed that subpart (i)--the *estimation* of future market values--is at issue, in that appraisal and a competitive bid sale were not ultimately utilized by MPC in its proposal.

¶52 Returning to the question of policy underlying the foregoing statutory mandates, it is obvious that the Act requires that the Commission balance two conflicting objectives--protecting the interests of the consumers and fostering the financial integrity of electrical utilities--in determining the extent to which MPC may recover transition costs. Thus, the issue boils down to whether the Commission has the statutory "flexibility" to oblige MPC's proposed use of a cost tracking method--which entails proposed costs that are "unknown"--in light of the policy to protect consumers coupled with the mandate that all estimated transition costs must be verified, unrecoverable, affirmatively shown, subjected to mitigation, demonstrable, viewed on a net basis, and reduced to an "amount."

¶53 Obviously, the tracking method of recovering transition costs was not expressly provided for by the Legislature when it enacted the Act in 1997, nor when it revised portions of the Act, including § 69-8-211, MCA, in 1999, nor when it again amended portions of the Act during the recent 2001 session. Further, contrary to MPC's contentions,

there is no express indication that utilities must be entitled to a full recovery of all "actual" transition costs identified under § 69-8-211, MCA. Rather, "the commission shall allow recovery" of transition costs "subject to the provisions of this section," which the Legislature recognized would be determined by the Commission based, in part, on estimates of future market values.

¶54 We conclude, therefore, that MPC's cost-tracking method--whereby some, but not all, transition costs proposed by a utility would be unknown and therefore subject to the caprice of future events--is entirely inconsistent with the statutory mandates placed on the Commission that *all* costs subject to its determination must be: (1) "verifiable;" (2) established as "unrecoverable;" (3) affirmatively shown; (4) reasonably mitigated; (5) "reasonably demonstrable;" (6) reduced to a "net" sum; and (7) reduced to an "amount" in a final order.

¶55 The principle of finality that the foregoing mandates express is further emphasized by § 69-8-211(5), MCA, which declares that the Commission's approval of transition costs, as well as the subsequent collection of those transition costs through transition charges, "is a settlement of *all* transition costs claimed by a public utility." (Emphasis added). As indicated by Black's Law Dictionary, a "settlement," in legal parlance, means to fix or resolve conclusively. *See* Black's, at 1372 (6th ed. 1990). In a different context, but nevertheless in broad terms, this Court recently concluded that the term "settlement" was synonymous with an enforceable bilateral contract that discharges a future or existing obligation. *See Watters v. Guaranty Nat. Ins. Co.*, 2000 MT 150, ¶ 40, 300 Mont. 91, ¶ 40, 3 P.3d 634, ¶ 40.

¶56 We conclude that such finality, as indicated by the inclusion of the term "settlement" under § 69-8-211(5), MCA, is the overarching intent of the Act, where the need of consumers to effectively plan today takes precedence over precise cost analysis extending years if not decades into the future. Like any "settlement," the parties here must play the role of clairvoyant, to some extent, in an endeavor that requires attaining certainty now based on an unknown future. And, in the end, pursuant to statutory mandate, it is the Commission that assumes the role of arbiter in determining and fixing MPC's transition costs, if any, that in turn will be discharged at the consumers' expense.

¶57 Thus, we hold that the Commission's interpretation of the Act was correct, and that it therefore did not violate any statutory provisions under the Act. We conclude, therefore, that a judicial mandate directed at the Commission to allow the use of the proposed

"trackers," would require the Commission to bend if not violate the law, and therefore cannot be sustained.

¶58 Accordingly, the order of the District Court is reversed and vacated, and the order of the Commission is reinstated.

/S/ JAMES C. NELSON

We Concur:

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

/S/ PATRICIA COTTER

/S/ TERRY N. TRIEWEILER

/S/ JIM RICE

/S/ Richard G. Phillips,

District Court Judge,

sitting for Chief Justice Karla M. Gray