FILED

04/30/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0289

DA 23-0289

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 89

PHOENIX CAPITAL GROUP HOLDINGS, LLC,
a Delaware limited liability company,

Plaintiff, Appellant,
and Cross-Appellee,

v.

BOARD OF OIL AND GAS CONSERVATION
OF THE STATE OF MONTANA,

Defendant, Appellee,
and Cross-Appellant,

and

KRAKEN OIL AND GAS LLC,

Intervenor, Appellee,
and Cross-Appellant.

APPEAL FROM:     District Court of the Thirteenth Judicial District,
                 In and For the County of Yellowstone, Cause No. DV-56-2021-1591
                 Honorable Colette B. Davies, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                Adrian A. Miller, Michelle M. Sullivan, Sullivan Miller Law PLLC,
                Billings, Montana

        For Appellees:

                Liz Leman, Agency Legal Counsel, Montana Department of Justice,
                Helena, Montana (for Board of Oil and Gas Conservation of the State of
                Montana)

                Jeffrey J. Oven, Brett L. Kvasnicka, Crowley Fleck PLLP, Billings,
                Montana (for Kraken Oil and Gas, LLC)

Submitted on Briefs:  February 7, 2024

Decided:  April 30, 2024

Filed:

_____
                        Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Phoenix Capital Group Holdings, LLC (Phoenix) appeals an April 17, 2023 Judgment entered by the Thirteenth Judicial District Court, Yellowstone County, in favor of Defendant Board of Oil and Gas Conservation of the State of Montana (Board) and Intervenor Defendant Kraken Oil and Gas LLC (Kraken) regarding the Board's decision to force pool mineral interests held by Phoenix and impose statutory penalties. The Board and Kraken have filed a combined cross-appeal of the District Court's exclusion of proffered evidence as hearsay.

¶2 We restate the issues as follows:

1. *Whether the District Court correctly affirmed the Board's determination that Kraken is entitled to forced pooling of Phoenix's mineral interests.*

2. *Whether the District Court correctly affirmed the Board's determination that Kraken is entitled to recover statutory risk penalties pursuant to § 82-11-202(2)(b), MCA.*

¶3 We affirm on both issues, and therefore do not address the cross-appeal.

### FACTUAL AND PROCEDURAL BACKGROUND

¶4 Phoenix is an oil and gas mineral rights investment firm that owns mineral interests on two sections of real property in Richland County, Montana. Phoenix acquired its interest by deed on February 26, 2021, from Steve Solis, who received the interests via transfer from Katherine Solis (Solis) earlier the same day.

¶5    Kraken is an energy production company and the operator of a spacing unit[1] covering the two sections of property with mineral interests held by Phoenix.  Starting in 2017, Kraken attempted to secure a lease of the mineral interests from then-owner Katherine Solis.  One of Kraken's employees, Lindsay Meszaros, made several attempts to obtain a voluntary lease agreement for the mineral interests but, each time she contacted Solis, Solis hung up the phone.  Kraken followed up on several occasions by mail, which also failed to prompt a response from Solis.  Eventually, in October 2017, Meszaros was able contact Solis and explain to her the provisions of the lease offer and that Solis would have the opportunity to participate in drilling wells in the spacing unit, but that non-participation by Solis would result in statutory non-consent "risk penalties."[2]  On February 28, 2018, Kraken sent Solis an election packet that included, for the first well to be drilled on the property (1H Well), the lease offer, election letter, and authorization for expenditure.  The packet was returned to Kraken unclaimed, and Kraken began drilling the well in June 2018.

¶6    In October 2018, the Board issued an Order designating both sections as a permanent spacing unit for oil and gas obtained from the 1H Well.  The Board issued a separate Order force-pooling the interests in the same area and allowing Kraken to recover

---

[1] A "spacing unit" is the acreage area that has been allocated for drilling of and production from a well or wells.  *See generally*, § 82-11-201, MCA.

[2] A "risk penalty" is an industry term describing the costs an operator may collect for undertaking the drilling and completion of a producing well on a non-participating landowner's property.  *See generally*, § 82-11-202(2), MCA.

4

risk penalties in relation to the 1H Well. In early January 2020, the Board approved Kraken's application for permits to drill more wells in the same spacing unit. Following this approval, on January 13, 2020, Kraken sent Solis additional election letters for the new wells that explained the required terms regarding timing, costs, and planned coverage area. The letters once again gave Solis the option of participating by paying a share of the costs or by leasing her mineral interests to Kraken. The letters also explained that, as with the initial 1H well, non-participation would result in assessment of risk penalties. According to the letters, Solis had 30 days to decide whether to participate in the drilling. Solis rejected service of the letters from Kraken. Kraken began "spudding" (drilling the new wells) on January 21, 2020, weeks prior to the expiration of the 30-day term stated in the election letters sent to Solis.

¶7     Just over a year later, on February 26, 2021, Phoenix acquired the mineral interests from Solis and informed Kraken of its purchase via email. Phoenix further indicated that it would like to participate in the oil and gas production from the wells being drilled by Kraken in the spacing unit. Kraken responded to Phoenix on March 18, 2021, explaining that the mineral interests had been deemed "non-consent," due to Solis's lack of participation, and stating it was authorized to recover risk penalties under § 82-11-202(2), MCA. On August 26, 2021, Kraken applied to the Board for a pooling order and imposition of risk penalties for the spacing unit, including the mineral interests now owned by Phoenix. The Board held a hearing on October 14, 2021, with both Phoenix and Kraken present and represented by counsel.

5

¶8    At the hearing, Phoenix argued that pooling was improper since it was now the owner of the mineral interests and wanted to voluntarily participate. Kraken argued that pooling was still appropriate because it had previously made good faith attempts to obtain Solis's participation but was unsuccessful. The Board concluded Kraken had made unsuccessful, good faith attempts to acquire voluntary pooling in the spacing unit, and that, as a successor in interest, Phoenix was bound to Solis's decision not to participate. The Board therefore determined that the mineral interests owned by Phoenix would be subject to forced pooling and that Kraken could recover risk penalties from Phoenix under § 82-11-202(2), MCA. Phoenix would receive a 12.5% royalty on the minerals.

¶9    Phoenix requested a rehearing from the Board, but that request was denied on December 1, 2021. Phoenix thereafter filed a Complaint seeking injunctive relief from the Board decision in the Thirteenth Judicial District Court, Yellowstone County. The parties submitted cross-motions for summary judgment, and the District Court held a hearing on the motions. On April 17, 2023, the District Court issued an Order granting Kraken and the Board's motions for summary judgment, and dismissing Phoenix's Complaint. The District Court reasoned the Board "was sufficiently thorough" in granting forced pooling and authorizing risk penalties, and there were otherwise no "compelling indications" that the Board erred in its ruling. Phoenix appeals.

**STANDARD OF REVIEW**

¶10    "We review a district court's grant of summary judgment de novo, using the same M. R. Civ. P. 56 criteria applied by the district court." *Cramer v. Farmers Ins. Exch.*, 2018

6

MT 198, ¶ 8, 392 Mont. 329, 423 P.3d 1067. Therefore, "[w]e review district court's conclusions of law to determine whether they are correct and its findings of fact to determine whether they are clearly erroneous." *Tractor & Equipment Co. v. Zerbe Bros.*, 2008 MT 449, ¶ 12, 348 Mont. 30, 199 P.3d 222. "Summary judgment is proper only when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law." *Emp'rs Mut. Cas. Co. v. Estate of Buckles*, 2019 MT 136, ¶ 6, 396 Mont. 153, 443 P.3d 534.

¶11 We also review agency decisions by applying the same standard as the district court. *Mont. Power Co. v. Mont. PSC*, 2001 MT 102, ¶ 18, 305 Mont. 260, 26 P.3d 91. An order issued by the Board is not binding on this Court but shall be considered "prima facie valid." *See* § 82-11-144, MCA. When reviewing a Board order, a court's role "is not to say whether it would have granted" the order; rather, the reviewing court must determine whether the Board was "sufficiently thorough and discerning in its decision-making process . . . ." *Mont. Wildlife Fed'n v. Mont. Bd. of Oil & Gas Conservation*, 2012 MT 128, ¶ 51, 365 Mont. 232, 280 P.3d 877. We may set aside a Board order for a number of reasons, including if it is arbitrary, capricious, or in excess of statutory authority. *See* § 82-11-144(2), MCA.

## DISCUSSION

¶12 *1. Whether the District Court correctly affirmed the Board's determination that Kraken is entitled to forced pooling of Phoenix's mineral interests.*

¶13 Under § 82-11-202(1)(b), MCA, the Board must decide whether the applicant for pooling "has made an unsuccessful, good faith attempt to voluntarily pool the interests

7

within the spacing unit" before it can issue a force-pooling order. Phoenix argues that its offers to voluntarily pool in the months prior to Kraken's application preclude the Board's Order pooling the mineral interests because Kraken's rejections of those offers cannot constitute an unsuccessful, good faith attempt. We disagree, and hold that the Board correctly interpreted the statutory force-pooling requirements, and that its decision to force pool Phoenix's mineral interests was reasonable.

¶14 Throughout 2017, Kraken repeatedly attempted to lease the mineral interests from Solis or obtain her participation. Meszaros, Kraken's employee, contacted Solis by phone and by mail, and each time was rejected. When Meszaros was finally able to engage Solis in a conversation, Meszaros made clear the offered terms for a lease of the mineral interests, and that Solis could also elect to participate in the drilling. She also advised Solis of potential risk penalties if Solis did not participate. Thereafter, when Kraken sent an election packet to Solis, Solis refused delivery. Following these failed attempts, Kraken justifiably interpreted Solis's response as a rejection of an offer to participate.

¶15 As the District Court noted, a central question on this issue is whether, under § 82-11-202(1)(b), MCA, the ownership response was to come from Solis, the owner of the mineral interests when contact was made and the wells were drilled, or Phoenix, the owner at the time Kraken applied for the force-pooling order. We look to the governing statutes and begin with the plain language. *State v. Christensen*, 2020 MT 237, ¶ 95, 401 Mont. 247, 472 P.3d 622. "The rules of statutory construction require this Court to construe

8

several interrelated statutes in a manner which will give effect to each of them." *In re U.A.C.*, 2022 MT 230, ¶ 13, 410 Mont. 493, 520 P.3d 295.

¶16 The statute states that the Board may enter a force-pooling order "if the applicant has made *an unsuccessful, good faith attempt to voluntarily pool* the interests within the permanent spacing unit." Section 82-11-202(1)(b), MCA (emphasis added). We agree with the District Court's observation that "[t]he statute does not require multiple follow-up attempts to voluntarily pool mineral interests with subsequent interest owners on wells where drilling has already commenced." The statute does not mention owners who may succeed to the interest after the operator has already made an attempt to voluntarily pool. Kraken attempted to engage Solis on approximately eight separate occasions—none of which generated a positive response by Solis. Kraken also re-engaged by attempting to contact Solis regarding each well it planned to drill after the initial 1H well, but Solis rejected these communications as well, and never agreed to participate in the drilling. By the time Phoenix purchased the mineral interests, over a year had passed since Kraken began drilling the wells.

¶17 Requiring Kraken to repeat such attempts with subsequent owners, or otherwise accept Phoenix's belated offers to voluntarily enter a pooling agreement could undermine the statute's purpose. Operators would be subject to continuing financial uncertainty regarding drilling and project funding. Owners acquiring mineral interests after significant funding has already been expended and risk already undertaken could nonetheless then insist that operators grant them the chance to participate—even if the prior owner had

9

refused. This would permit the new owners to reap the then-known benefits of voluntary participation without having first undertaken the associated risk.

¶18 Phoenix also contends that Kraken could not have acted in good faith by applying for a pooling order *after* Phoenix requested to voluntarily pool the mineral interests. However, the timing of Kraken's application for a pooling order neither contradicted the statute nor constituted a per se exercise of bad faith. Section 82-11-202(1)(b), MCA, does not prohibit operators from seeking a force-pooling order after a permanent spacing unit has been created. Kraken's delayed application to the Board, filed after being unable to obtain voluntary pooling and after completing drilling on its own, is reflected in the record as a typical industry practice. Since costs and penalties are "taken out of production," operators generally wait until wells are complete to seek a pooling order, as only then will they know whether production will be successful and permit costs to be recovered from any non-participating mineral interest owners. Kraken here applied for a pooling order seeking to allocate costs and production from the wells approximately one week after the wells were completed. The fact that Kraken applied for a pooling order after receiving Phoenix's offer to participate is thus not, by itself, indicative of bad faith. We affirm the District Court's determination that Kraken made unsuccessful, good faith attempts to obtain a voluntary agreement, and that the Board did not err by entering the force-pooling Order.

¶19 *2. Whether the District Court correctly affirmed the Board's determination that Kraken is entitled to recover statutory risk penalties pursuant to § 82-11-202(2)(b), MCA.*

10

¶20 "Risk penalty" assessment is governed by § 82-11-202(2), MCA, which provides:

(2)(a) As to each owner who refuses to pay the owner's share of the costs of development or other operations referred to in subsection (1) [pooled interests], the order must provide for payment of the owner's share of the cost out of and only out of production from the well allocable to the owner's interest in the permanent spacing unit . . . .

(b) If a well has been drilled prior to the hearing on the application and an owner, after written demand, has failed or refused to pay the owner's share of the costs of development or other operations referred to in subsection (1) . . . in addition to the costs under subsection (2)(a), the order must include as costs:

(i)     100% of the refusing owner's share of the cost of newly acquired surface equipment beyond the wellhead connections, including but not limited to stock tanks, separators, treaters, pumping equipment, and piping, plus 100% of the refusing owner's share of the cost of operation of the well commencing with first production and continuing until the agreeing owners have recovered the costs; and

(ii)    200% of the refusing owner's share of the costs and expenses of staking, well site preparation, obtaining rights-of-way, rigging up, drilling, reworking, deepening or plugging back, testing, and completing the well, after deducting any cash contributions received from the refusing owners by the agreeing owners, and 200% of that portion of the cost of equipment in the well, including the wellhead connections.

Consequently, risk penalties are non-discretionary once a well has been drilled and an owner has refused to pay a share of the costs after written demand.

¶21 Phoenix argues the Board and District Court incorrectly applied risk penalties because Kraken did not satisfy the criteria to obtain them under § 82-11-202(2)(b), MCA. Phoenix first argues that Kraken's election letters sent to Solis did not constitute "written demand[s]" under the statute.

11

¶22 When a well has been drilled before a pooling order has been entered, the Board must impose risk penalties on an owner who, "after written demand, has failed or refused to pay the owner's share of the costs of development or other operations." Section 82-11-202(2)(b), MCA. As the District Court noted, "written demand" does not have a defined meaning under the statute, but a "demand" is generally understood as "the assertion of a legal or procedural right." *See* Demand, Black's Law Dictionary 542 (11th ed. 2019).

¶23 We conclude Kraken's letters to Solis constituted written demands that gave Solis the option to either participate or face assessment of risk penalties. The content of the letters themselves supports this conclusion. They read, "[If Solis] elects not to participate, the participating owners plan to impose a risk penalty as provided by Montana law." Plainly, Kraken was asserting a legal right to payment for Solis's non-participation in the drilling. Phoenix responds that these letters did not demand immediate payment of a set amount and therefore were only "speculative future costs" based on an "estimated calculation of [Solis's] interest." However, these letters were far more than merely informational. Kraken gave specific cost and production information to Solis, and provided a particular timeline necessary for her decision to participate: "Each working interest owner has thirty (30) days from the receipt of this letter to accept or reject this well proposal." Kraken laid out the decision to be made by Solis and advised her of the consequences for ignoring the election letter. The absence of a provision specifically requesting immediate payment of Solis's share of costs did not render the letters less than a demand.

¶24 Second, Phoenix argues Kraken cannot obtain risk penalties because it failed to comply with § 82-11-202, MCA, by spudding the later wells before Solis's time to respond to the January 13, 2020 election letters had expired. Phoenix argues the Board erroneously applied the presumption of owner non-participation under § 82-11-202(3)(a), MCA (2021), based merely on Solis's failure to pay her share of costs after receiving the letters. The Board and Kraken respond that neither the Board nor the District Court relied on the statutory presumption of non-participation for their decisions, but rather upon the determination that Solis *actually* failed or refused to participate in all of the wells operated by Kraken.

¶25 The statutory presumption of owner non-participation provides as follows:

> (3)(a) An owner is presumed to have refused to pay the owner's share of costs if prior to the spud date of the well, the owner fails to pay or agree in writing to promptly pay the share of the costs after notice by the well operator either:
>
> (i)     acknowledged in writing by the owner as received; or
>
> (ii)    sent at least 30 days prior to the spud date of the well to the owner by certified mail, addressed to the owner's address of record in the office of the clerk and recorder of the county where the well is to be drilled or to the owner's address on file with the board.

Section 82-11-202(3)(a), MCA (2021).[3]

---

[3] In 2023, § 82-11-202(3), MCA, was revised and the requirement that notice must be "sent 30 days prior to the spud date of a well" was removed and replaced with a provision requiring a notice to "allow the owner 30 days to elect to pay the owner's share of costs." *See* 2023 Mont. Laws ch. 441, § 1.

¶26     We agree that reliance on the presumption of non-participation is unnecessary here, where the record establishes Solis's failure or refusal to participate and pay a share of the costs of drilling. Kraken had previously contacted Solis unsuccessfully when it sent Solis election letters on January 13, 2020. Consistent with the previous contacts, Solis rejected service of the letters, which were returned to Kraken. Thereafter, Solis never contacted Kraken or expressed a desire to participate within the 30-day window, or at all. Waiting to spud the wells until after the 30-day period would have changed nothing. Waiting to spud the wells would become critical when an owner's intent is not apparent and the Board must rely on the presumption to move forward. Here, as before, Solis affirmatively rejected Kraken's letters and expressed no interest in even communicating with Kraken, let alone participating in the costs of drilling. Phoenix presented no evidence that Solis did not understand the import of her actions. Consequently, risk penalties were imposed, not pursuant to the presumption in § 82-11-202(3), MCA (2021), but under § 82-11-202(2), MCA, which requires an owner pay risk penalties when "after written demand, [the owner] has failed or refused to pay the owner's share of the costs of development or other operations . . . ."

¶27     Finally, Phoenix argues the 30-day notice requirement and presumption in subsection § 82-11-202(3), MCA (2021), must control because there is no timeframe provided for payment under subsection (2). Phoenix contends that, consequently, it retained an option to participate after the January 2020 election letters were sent out to Solis, but before Kraken's application to the Board in August 2021, and therefore did not

14

fail to pay its share because it offered to participate in February 2021. However, as noted by Kraken, at the close of the election period (in this case, 30 days), the right to obtain risk penalties attaches if the Board finds the owner has "failed or refused to pay" after receiving a written demand. Here, Solis's failure to participate occurred in January 2020, over a year before Phoenix became involved with the property in February 2021. Adopting Phoenix's position would defeat the purpose of election periods and risk penalties, as mineral interest owners could evade the penalties by simply ignoring the stated election period and waiting until drilling has been completed to offer cost participation, without consequence. We hold the District Court correctly upheld the risk penalties imposed by the Board.

¶28 Affirmed.

/S/ JIM RICE

We concur:

/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR