JUSTICE LEAPHART
delivered the Opinion of the Court.
¶1 The Havre Daily News and other Montana newspapers (collectively, “the Newspaper”) sued the City of Havre, Havre Police Chief Kevin Olson and other members of the Havre Police force (collectively, “Havre”), seeking dissemination of an unredacted initial “incident report” and the accompanying officer’s “narrative.” The Newspaper also requested the District Court to order Havre to develop and implement a general policy to govern the dissemination of initial offense reports. Because Havre provided the Havre Daily News with the unredacted report, the District Court granted summary judgment in favor of Havre, ruling that the case was moot and non-justiciable, but awarded attorney fees to the Newspaper. The Newspaper now appeals and Havre cross-appeals the award of attorney fees. We affirm in part, reverse in part and remand.
¶2 The following issues are dispositive of this appeal:
¶3 (1) whether the District Court erred in denying the Newspaper’s motion for a default judgment;
¶4 (2) whether the District Court erred in granting summary judgment in favor of Havre; and
¶5 (3) whether the District Court erred in determining that the Newspaper may recover attorney fees incurred prior to receiving the unredacted reports.
FACTUAL AND PROCEDURAL BACKGROUND
¶6 The focus of this dispute is a police report describing an officer’s investigation that culminated in charges being levied against several *335 individuals for underage drinking. Looking into allegations that the police had shown preferential treatment to an officer’s child, Winderl (a reporter for the Havre Daily News) requested to view the initial “incident report” and the accompanying “narrative” prepared by the investigating officer (collectively, “Reports”). The Havre Police Department provided Winderl with both Reports, which he read. Winderl requested a copy of the Reports, and an officer eventually provided him with copies in which the names of two uncharged juvenile witnesses and the parent of one of those juveniles were redacted. Approximately two and a half months later, the Newspaper sued to obtain an unredacted copy of the Reports.
¶7 The Newspaper filed a complaint on March 10, 2004. The complaint detailed the facts surrounding Winderl’s receipt of the redacted Reports and requested the court to order Havre to release the unredacted Reports as well as to develop and implement a policy governing future dissemination of such reports (“prospective relief’). More specifically, the Newspaper’s request for prospective relief sought the following: (1) implementation of a policy requiring immediate dissemination of complete copies of initial incident reports to the public upon request; (2) a provision that the public pay only the actual cost of reproduction for such copies;[1] and (3) a mandate that particular information (i.e., the name, age, occupation, family status, date of birth and residence of the accused) be included in each initial incident report. Whereas the complaint contained thirty-eight factual allegations, thirty-seven of which pertained only to Winderl’s request for the Reports, the Newspaper used this incident as leverage to seek judicial implementation of a broad policy governing all hypothetical, future requests for initial incident reports. On March 29,2004, Havre provided the Havre Daily News with an unredacted copy of the Reports. On April 30, 2004, having never answered the Newspaper’s complaint, Havre moved for summary judgment. The Newspaper, in turn, moved for default judgment on the pleadings, pursuant to M. R. Civ. P. 12(c) and 55.
¶8 The District Court granted Havre’s request for summary judgment and denied the Newspaper’s request for default judgment. The court *336 awarded attorney fees to the Newspaper and ordered the Newspaper to file and serve an affidavit of fees and costs. Counsel for the Newspaper never filed such an affidavit with the court. Instead, the Newspaper filed this appeal.
STANDARDS OF REVIEW
¶9 ‘We review a district court’s conclusions of law to determine whether the court’s interpretation of the law is correct.” Chamberlin v. Puckett Construction, 277 Mont. 198, 202-03, 921 P.2d 1237, 1240 (1996). Whether a party may avoid default judgment when she fails to answer a complaint and instead files a motion for summary judgment is purely a question of law.
¶10 We review a District Court’s grant of summary judgment de novo. ... We apply the standard declared by Rule 56, M.R.Civ.P. The moving party must establish the absence of a genuine issue of material fact and her entitlement to judgment as a matter of law. We review a district court’s conclusions of law to determine whether they are correct.” Baltrusch v. Baltrusch, 2006 MT 51, ¶ 11, 331 Mont. 281, ¶ 11, 130 P.3d 1267, ¶ 11 (citations omitted).
¶11 “Whether or not a party is entitled to recover attorney fees is ‘strictly a question of law.’ Thus, ‘[w]e review a district court’s conclusions of law pertaining to the recovery of attorney’s fees to determine whether those conclusions are correct.’ ” Chase v. Bearpaw Ranch Ass’n, 2006 MT 67, ¶ 14, 331 Mont. 421, ¶ 14, 133 P.3d 190, ¶ 14 (quoting Transaction Network v. Wellington Tech., 2000 MT 223, ¶ 17, 301 Mont. 212, ¶ 17, 7 P.3d 409, ¶ 17 (citation omitted; modification in original)).
DISCUSSION

Issue 1: Whether the District Court erred in denying the Newspaper’s motion for a default judgment.

¶12 The Newspaper argues that the District Court should have granted its motion for a default judgment because Havre never answered its complaint, thereby effectively admitting the allegations complained therein. The Newspaper asserts that M. R. Civ. P. 7 limits responsive pleadings to an answer and urges us to reverse Klock v. Town of Cascade, 284 Mont. 167, 943 P.2d 1262 (1997), to the extent that it conflicts with Rule 7. Essentially, the Newspaper contends that allowing a party to circumvent the Rules of Civil Procedure-by filing a motion for summary judgment in lieu of an answer-will erode the structure of civil litigation that is built upon these carefully designed rules.
*337 ¶13 Havre argues that its motion for summary judgment constitutes a responsive pleading to the complaint; therefore, the court properly denied the Newspaper’s motion for default judgment on the pleadings. Havre notes that pursuant to M. R. Civ. P. 55, as interpreted by this Court in Klock, a motion for summary judgment is a defense to a complaint. Consequently, Havre contends, a court may not enter default judgment against a party who moves for summary judgment but fails to answer a complaint. We agree.
¶14 M. R. Civ. P. 55(a), requires the clerk to enter default judgment against a defendant who “has failed to plead or otherwise defend as provided by these rules ....” In Klock, this Court held that a motion for summary judgment satisfies the requirement that a party “otherwise defend” in order to escape default judgment. 284 Mont. at 173, 943 P.2d at 1266. Federal courts construing Rule 55(a) of the Federal Rules of Civil Procedure, which is identical to Montana’s rule, have likewise concluded that a defendant may escape default judgment by filing a motion for summary judgment. See, e.g., Rashidi v. Albright, 818 F. Supp. 1354, 1355-56 (D. Nev. 1993).
¶15 The Newspaper insists that Klock conflicts with M. R. Civ. P. 7, which provides that, aside from various iterations of complaints, answers, and replies, “[n]o other pleading shall be allowed....” Because M. R. Civ. P. 55(a), explicitly contemplates defenses other than pleadings, however, no such conflict exists. A defendant may defend by filing an answer. In addition, a defendant may “otherwise defend,” for example by filing a motion for summary judgment or a motion to dismiss pursuant to M. R. Civ. P. 12(b). Havre’s motion for summary judgment sufficed to prevent the District Court from entering default judgment in favor of the Newspaper.

Issue 2: Whether the District Court erred in granting summary judgment in favor of Havre.

A. Ripeness:
¶16 The Newspaper argues that the District Court erred in granting summary judgment because its request for prospective relief presents a justiciable issue. The Newspaper asserts that it has an existing constitutional right to receive the information contained in initial arrest and offense reports and that a judgment of the court will protect this right.
¶17 Havre argues that, with respect to the Newspaper’s request for prospective relief, no real dispute exists over which the court may exercise judicial authority. Havre maintains that cases arising under the constitutional right to know, Article II, Section 9, of the Montana Constitution, should be determined on a case-by-case basis, and no *338 single rule of decision can apply to all future controversies. Accordingly, Havre contends, adjudication in this case cannot operate as a final judgment prospectively resolving future requests for disclosure of initial offense and arrest reports. We agree that determining which criminal justice information may be disseminated to the public requires a factually specific inquiry that renders prospective adjudication inappropriate.
¶18 The existence of a justiciable controversy is a threshold requirement to a court’s adjudication of a dispute, consisting of three elements as identified in Montana-Dakota Util. Co. v. City of Billings, 2003 MT 332, ¶ 9, 318 Mont. 407, ¶ 9, 80 P.3d 1247, ¶ 9. Among other reasons, a case may be non-justiciable because it presents an issue that is not ripe for judicial determination. Erwin Chemerinsky, Federal Jurisdiction, § 2.1, 44 (4th ed., Aspen 2003). Although the Newspaper and Havre quibble over whether this case presents a justiciable controversy under Montana-Dakota Util., their disagreement is more precisely characterized as an issue of ripeness. Because justiciability encompasses ripeness, the parties have properly raised, albeit imprecisely, the question of whether the Newspaper’s request for prospective relief is ripe for review.
¶19 The doctrine of ripeness “requires an actual, present controversy, and therefore a court will not act when the legal issue raised is only hypothetical or the existence of a controversy merely speculative.” Montana Power Co. v. Public Service Comm., 2001 MT 102, ¶ 32, 305 Mont. 260, ¶ 32, 26 P.3d 91, ¶ 32. The basic rationale behind the ripeness doctrine is “to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements].]” Montana Power Co., ¶ 32; Abbott Labs. v. Gardner, 387 U.S. 136, 148, 87 S. Ct. 1507, 1515 (1967), overruled on other grounds Califano v. Sanders, 430 U.S. 99, 975 S. Ct. 980 (1978); see also Socialist Labor Party v. Gilligan, 406 U.S. 583, 588, 92 S. Ct. 1716, 1719 (1972) (“[jurisdiction] should not be exercised unless the case tenders the underlying constitutional issues in clean-cut and concrete form. . . . Problems of prematurity and abstractness may well present insuperable obstacles to the exercise of the Court’s jurisdiction”) (internal quotations and citations omitted).
¶20 In considering whether a case is ripe for review, federal courts consider the “fitness of the issues for judicial review” and the extent of hardship that will be suffered by the parties if the court withholds review. Artway v. Attorney General of State of N.J., 81 F.3d 1235, 1247 (3rd Cir. 1996). In conducting the former inquiry, “[t]he principal consideration is whether the record is factually adequate to enable the *339 court to make the necessary legal determinations. The more the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa.” Artway, 81 F.3d at 1249.
¶21 Here, the Newspaper presents a question for adjudication that inherently requires this Court to engage in a fact-intensive inquiry. Each determination regarding the dissemination of criminal justice information requires careful, fact-specific balancing of conflicting constitutional rights. The Montana Constitution imbues the citizenry with a right of privacy, Article II, Section 10, as well as a right to examine documents of “state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure[,]” Article II, Section 9. As this Court has recognized, these rights “inevitably conflict in cases involving a request for confidential criminal justice information ....” Bozeman Daily Chronicle v. Police Dept., 260 Mont. 218, 224, 859 P.2d 435, 439 (1993).
¶22 Although the Newspaper confidently asserts that the Reports in this case have been statutorily designated as public criminal justice information, see § 44-5-103(13)(e)(i)-(ii), MCA (designating initial offense reports and initial arrest reports as public criminal justice information, but failing to further define either term[2]), their proper classification is not such a simple matter.[3] Ultimately, it matters little *340 whether these Reports are statutorily designated as public criminal justice information, as such legislative classification cannot obviate the inherent tension between the constitutionally protected right of privacy and the constitutionally guaranteed right to know. Notwithstanding its designation as public criminal justice information, an initial offense report will sometimes contain discrete pieces of information that qualify as confidential criminal justice information, or information in which an individual, with notice of possible disclosure, has voiced her subjective expectation of privacy and for which the demands of individual privacy vastly outweigh the merits of public disclosure. Victims of child abuse or “sex crimes, for example, may have a legitimate expectation of privacy[,]” In Re Lacy, 239 Mont. 321, 324, 780 P.2d 186, 188 (1989), that would preclude publicly disseminating their names and, depending on the circumstances, the location of the crime or other identifying information. Indeed, this Court has recognized that suspects, particularly during the early phase of an investigation (precisely the phase that will be referenced in an initial offense report) may have a cognizable expectation of privacy. In Re Lacy, 239 Mont. at 324, 780 P.2d at 188. As a final example, witnesses to a gang killing-whose safety may be jeopardized by public circulation of their names or addresses-may have a privacy interest in such information that clearly outweighs the merits of public disclosure.
¶23 In each of these hypothetical cases, in order to balance the constitutional right to know against the conflicting constitutional right of individual privacy, a reviewing court[4] would first ascertain whether the individual has an actual expectation of privacy. Bozeman Daily Chronicle, 260 Mont. at 225, 859 P.2d at 439. This, of course, is purely a question of fact, which entails determining whether the individual whose privacy interest is at issue has notice of possible disclosure. The court would then ascertain whether society recognizes this expectation as reasonable. Bozeman Daily Chronicle, 260 Mont. at 225, 859 P.2d at *341 439. This determination of law necessarily involves reasoned consideration of the specific facts underlying the dispute. To provide but a few examples, the following inquiries may prove relevant in evaluating the reasonableness of an individual’s expectation of privacy: (1) attributes of the individual, including whether the individual is a victim, witness, or accused and whether the individual holds a position of public trust, Jefferson County v. Montana Standard, 2003 MT 304, ¶ 17, 318 Mont. 173, ¶ 17, 79 P.3d 805, ¶ 17; Bozeman Daily Chronicle, 260 Mont. at 227, 228, 859 P.2d at 441; Svaldi v. Anaconda-Deer Lodge County, 2005 MT 17, ¶ 31, 325 Mont. 365, ¶ 31, 106 P.3d 548, ¶ 31; (2) the particular characteristics of the discrete piece of information, Jefferson County, ¶ 20 (holding that an individual has a protected privacy interest in her social security number and driver’s license number); Bozeman Daily Chronicle, 260 Mont. at 228-30, 859 P.2d at 441-42 (holding that the names of witnesses and the victim of a sexual assault cannot be disseminated and concluding that “[an in camera] review of [investigative reports] is, however, essential in determining whether or not the privacy interests of the victim and witnesses can be protected while disseminating the remainder of the information[,]” and further recognizing that a protective order may be necessary to properly protect those privacy interests); and (3) the relationship of that information to the public duties of the individual, Jefferson County, ¶¶ 17, 20; Bozeman Daily Chronicle, 260 Mont. at 226-27, 859 P.2d at 440-41. The important point is that among the vast spectrum of information, innumerable facts-placed within the particular context of a specific dispute-may bear on the assessment of reasonableness in hypothetical future disputes. Finally, the court would weigh the demands of individual privacy against the merits of public disclosure. Bozeman Daily Chronicle, 260 Mont. at 227, 859 P.2d at 441. Such balancing demands that the court determine the merits of publicly disclosing the discrete pieces of information at issue, which again involves a fact-specific inquiry, taking consideration of the particular context from which such disclosure will proceed. See, e.g., Engrav v. Cragun, 236 Mont. 260, 267, 769 P.2d 1224, 1229 (1989) (considering the purpose for which public criminal justice information is sought before determining that the names included on initial arrest reports need not be disseminated).
¶24 Prospective relief is inappropriate because each of these three determinations necessarily involves a factually specific inquiry, which “requires this Court to balance the competing constitutional interests in the context of the facts of each case,” Missoulian v. Board of Regents of Higher Educ., 207 Mont. 513, 529, 675 P.2d 962, 971 (1984). *342 Accordingly, “in the absence of a concrete fact situation in which the competing [constitutional right to know and right to privacy] can be weighed,” this Court simply cannot “determine whether an effort to compel disclosure of [criminal justice information] would or would not be barred,” California Bankers Ass’n v. Schultz, 416 U.S. 21, 56, 94 S. Ct. 1494, 1515 (1974).
¶25 The dissent recasts the Newspaper’s claim as a request that Havre implement systematic procedures to govern dissemination of initial incident reports and characterizes that claim as a request for relief “from a real, presently existing, and readily identifiable problem which implicates the public’s right to know-i.e., the Police Department’s lack of procedures governing its decisions to withhold information contained in initial incident reports.” ¶ 51. In the course of this creative endeavor, the dissent overlooks a determinative fact,[5] which renders even this strained reformation of the Newspaper’s complaint unripe: that is, the Newspaper’s claim does not allege any discernible violation of the law that might form the basis of a justiciable controversy. Montana’s Constitution provides that “[n]o person shall be deprived of the right to examine documents or to observe the deliberations of all public bodies or agencies of state government and its subdivisions, except in cases in which the demand of individual privacy clearly exceeds the merits of public disclosure.” Mont. Const, art. II, § 9. The dissent acknowledges that even in the face of a policy, government agencies will need to make discrete ad hoc determinations in order to adequately protect privacy rights. In the absence of a case specific determination, there can be no violation of the clear command of Article II, Section 9 of Montana’s Constitution. Not until a person has been denied access to a document has that person been deprived of her “right to examine” any document. The mere absence of a policy governing dissemination of documents does not ripen into a violation of the constitutional right to know unless and until an identifiable person is actually denied access to a particular document or a specific deliberation. The dissent would enable well-funded litigants who simply disagree with the policies governing dissemination of a government agency’s documents to drag the agency into court, and to challenge the perceived constitutional flaws of such *343 a policy, wholly divorced from any factually based, concrete violation of the constitutional right to know. Operating in this manner would have one decided advantage: This Court could simply dispense with the practice of reviewing the often cumbersome factual records that provide the basis for our applications of the law and, like the dissent, turn to facts that are not of record in a case, picking and choosing those which are most convenient to the desired outcome of the academic dispute at hand. Nevertheless, this Court may not rely on facts outside of the record in resolving an issue before it. Huffine v. Boylan, 239 Mont. 515, 517, 782 P.2d 77, 78 (1989).
¶26 The dissent relies heavily on Great Falls Trib. v. Mont. Pub. Ser. Com., 2003 MT 359, 319 Mont. 38, 82 P.3d 876, wherein this Court articulated a presumption of openness and the “‘affirmative’ duty [of] government officials to make all of their records and proceedings available to public scrutiny.” ¶ 54. In stark contrast to most cases relating to dissemination of criminal justice information, Great Falls Trib. only involved the rights of corporate entities, rather than the rights of private individuals. ¶ 39, ¶ 56. Thus the right of privacy was not at issue. See Great Falls Trib., ¶ 39 (“non-human entities do not enjoy privacy rights under the right of privacy provision of the Montana Constitution”). Accordingly, this Court’s articulation of a presumption of openness and “affirmative duty of disclosure cannot be read to nullify the need, in the first instance, to balance the right to know against the conflicting right of individual privacy on an ad hoc basis when both rights are at issue. Given the “inevitable conflict” that arises with requests for confidential criminal justice information, Bozeman Daily Chronicle, 260 Mont. at 224, 859 P.2d at 439, a requirement that governmental agencies provide unredacted copies on demand is untenable. Given society’s concern over the erosion of individual privacy, it would eviscerate the constitutional right of privacy to require agencies to disclose unredacted documents on demand, leaving the media, unbound by any constitutional mandate or judicial scrutiny, to unilaterally make decisions concerning Montanans’ privacy rights.
¶27 The Newspaper’s request for prospective relief lacks any concrete factual basis[6] and represents a request for relief from a purely *344 hypothetical future violation of its right to know. Accordingly, the Newspaper’s request for prospective relief presents an unripe and, therefore, non-justiciable, controversy.
B. Mootness:
¶28 The Newspaper’s request for prospective relief fails for want of ripeness. The question remains, however, whether the District Court properly granted summary judgment with respect to the Newspaper’s claim that Havre illegally denied access to the unredacted Reports.
¶29 The Newspaper argues that the Havre Daily News’s receipt of the complete Reports concerning the underage drinking charges did not render this case moot. The Newspaper contends that this case falls within the exception to mootness for wrongs that are “capable of repetition, yet evading review,” Common Cause v. Statutory Committee, 263 Mont. 324, 328, 868 P.2d 604, 607 (1994) (quotations omitted), and that they have presented a constitutional issue that involves the “broad public concerns to avoid future litigation on a point of law,” Walker v. State, 2003 MT 134, ¶ 41, 316 Mont. 103, ¶ 41, 68 P.3d 872, ¶ 41 (quotations omitted). While apparently conceding that Havre could not repeat the identical behavior complained of, the Newspaper suggests that it will encounter similar obstructions in the future.
¶30 Havre argues that this case is moot because the Havre Daily News has already received the very Reports that the Newspaper seeks to obtain through this litigation. Havre suggests that the courts cannot provide relief with respect to Reports that the Newspaper has already procured. Havre maintains that it cannot repeat the alleged wrong, because it has already provided the Havre Daily News with the Reports at issue. Thus, no actual controversy remains; instead, only a hypothetical future controversy remains, which is not the “same action” contemplated by the above-mentioned exception to the mootness doctrine. We agree with Havre that the issue pertaining to the release of the Reports was mooted by the Havre Daily News’s receipt of the unredacted Reports.
¶31 Mootness is a threshold issue which we must resolve before addressing the substantive merits of a dispute. Grabow v. Montana High School Ass’n, 2000 MT 159, ¶ 14, 300 Mont. 227, ¶ 14, 3 P.3d 650, ¶ 14. “A matter is moot when, due to an event or happening, the issue *345 has ceased to exist and no longer presents an actual controversy.... A question is moot when the court cannot grant effective relief.” Shamrock Motors, Inc. v. Ford Motor Co., 1999 MT 21, ¶ 19, 293 Mont. 188, ¶ 19, 974 P.2d 1150, ¶ 19 (citations omitted). Commentators have described mootness as the “doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).” Henry Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973). Thus, a justiciable controversy in which the parties have a personal stake must exist at the beginning of the litigation, and at every point thereafter, unless an exception to the doctrine of mootness applies.
¶32 “This Court reserves to itself the power to examine constitutional issues that involve the broad public concerns to avoid future litigation on a point of law.” Walker, ¶ 41 (quotations omitted). In light of the foregoing ripeness analysis, future litigation on the scope of the constitutional right to know and its interaction with the constitutional right to privacy will not be avoided by issuing the prospective relief that the Newspaper has requested, nor by addressing the legality of Havre’s redaction of a portion of the since-revealed Reports. Thus, the Newspaper may not invoke this broad, mal-defined principle to resuscitate an otherwise moot controversy.
¶33 Federal courts have developed similar but distinct exceptions to mootness for wrongs “capable of repetition, yet evading review,” and “voluntary cessation” of a wrong. See, e.g., Iowa Protection and Advocacy Services v. Tanager, Inc., 427 F.3d 541, 543-44 (8th Cir. 2005). As its implementation by the federal courts makes clear, the exception to mootness for wrongs “capable of repetition, yet evading review” is properly confined to situations where the challenged conduct invariably ceases before courts can fully adjudicate the matter. See, e.g., Spencer v. Kemna, 523 U.S. 1, 18, 118 S. Ct. 978, 988 (1998) (declining to apply the exception because “[petitioner] has not shown ... that the time between [the challenged wrong] and [the occurrence rendering the case moot] is always so short as to evade review”) (emphasis added); see also, Roe v. Wade, 410 U.S. 113, 93 S. Ct. 705 (1973) (nine-month term of pregnancy effectively precludes full appellate review of restrictions on abortion prior to the completion of any individual plaintiffs pregnancy); Southern Pac. Terminal v. Interstate Commerce Commission, 219 U.S. 498, 514-15, 31 S. Ct. 279, 283 (1911) (short duration of Interstate Commerce Commission orders precludes appellate review prior to the orders’ expiration); Nebraska Press v. Stuart, 427 U.S. 539, 546, 96 S. Ct. 2791, 2797 (1976) (prior restraint on speech via a pre-trial gag *346 order evades review because of its inherently short duration); Dunn v. Blumstein, 405 U.S. 330, 333 n. 2, 92 S. Ct. 995, 998 n. 2 (1971) (one-year residency requirement for voter registration will evade review because by the time an individual’s challenge reaches the Supreme Court, invariably that individual has satisfied the residency requirement).
¶34 When, as here, a defendant’s challenged conduct is of indefinite duration, but is voluntarily terminated by the defendant prior to completion of appellate review, federal courts apply the “voluntary cessation” exception to mootness. See, e.g., Jews for Jesus, Inc. v. Hillsborough County Aviation Auth., 162 F.3d 627, 629 (11th Cir. 1998) (“voluntary cessation of a challenged practice renders a case moot only if there is no ‘reasonable expectation’ that the challenged practice will resume after the lawsuit is dismissed”). Although the exception for “voluntary cessation” of the challenged conduct is quite similar to the exception for wrongs “capable of repetition, yet evading review,” an important distinction separates the two. Due to concern that a defendant may utilize voluntary cessation to manipulate the litigation process,[7] “[t]he ‘heavy burden of persua[ding]’ the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.” Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167, 189, 120 S. Ct. 693, 708 (2000) (second modification in the original). In contrast, under the exception to mootness for wrongs “capable of repetition, yet evading review,” the party invoking the exception — generally the plaintiff — bears the burden of showing that the challenged conduct inherently is of limited duration, so as to evade review, and that “there [is] a reasonable expectation that the same complaining party [will] be subject to the same action again.” Spencer, 523 U.S. at 17-18, 118 S. Ct. at 988 (modifications in original); see also Skinner v. Lewis and Clark, 1999 MT 106, ¶ 18, 294 Mont. 310, ¶ 18, 980 P.2d 1049, ¶ 18 (imposing the burden on the party invoking the exception to mootness). We appreciate the importance of properly assigning this burden. Accordingly, we hereby adopt the federal exception to mootness for a party’s “voluntary cessation” of a challenged practice.
*347 ¶35 Relying on existing Montana law, both parties contest whether the current case falls under the exception for “wrongs capable of repetition, yet evading review.” Common Cause, 263 Mont. at 328, 868 P.2d at 607. This Court first adopted this exception to our mootness doctrine from federal jurisprudence. See Matter of N.B., 190 Mont. 319, 323, 620 P.2d 1228, 1231 (1980) (relying onRoe v. Wade to support our adoption of the exception to mootness for wrongs that “could be capable of repetition, yet could evade review”).
¶36 Generally, like the federal courts, this Court has limited application of this exception to situations where the challenged conduct is of inherently limited duration. See, e.g., Grabow, ¶ 15 (“[t]his exception recognizes that the amount of time inherent in the litigation process renders it nearly impossible in some cases for a final judicial decision to be reached before the case is rendered moot”) (emphasis added); see also, Common Cause, 263 Mont. at 327-28, 868 P.2d at 606-07 (concluding that the legislature’s confirmation of a recommended appointee five months after initial recommendation does not moot a challenge to the recommendation process); Matter of N.B. (holding that the expiration of a ninety-day involuntary commitment does not moot a challenge to the commitment order). On at least two previous occasions, however, this Court has applied the exception for wrongs “capable of repetition, yet evading review” to conduct that is of indefinite duration. See Heisler v. Hines Motor Co., 282 Mont. 270, 937 P.2d 45 (1997) (concerning the legality of defendant’s initial refusal to pay medical expenses, for which defendant subsequently provided payment); see also Montana-Dakota Util, (concerning the legality of a city ordinance that voters later overturned by ballot initiative). In both of these cases, we effectively conflated the exception for wrongs “capable of repetition, yet evading review,” with the exception for “voluntary cessation” of the challenged conduct. Our lack of precision, however, did not affect the ultimate outcome of these cases.[8] We now clarify that in Heisler and Montana-Dakota Util., this Court should have applied the exception to mootness for “voluntary cessation” of the challenged practice.
¶37 Here, the Newspaper challenged Havre’s obstruction of access to *348 certain information within the Reports. The duration of such obstruction is not inherently limited. Rather, it will inevitably persist until such time as Havre voluntarily, or under court order, reveals this information. Accordingly, this case is not amenable to consideration under the exception to mootness for wrongs “capable of repetition, yet evading review,” notwithstanding the Newspaper’s argument that this case falls under that exception. Nevertheless, because this Court has previously conflated these distinct exceptions to mootness, and because Havre voluntarily divulged the complete Reports before this or any court could review the legality of its having redacted portions of the Reports, we will consider whether this case comes under the exception for “voluntary cessation” of the challenged practice.
¶38 Under the “voluntary cessation” exception, a case may be mooted by the defendant’s voluntary conduct only when it is “absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.” Laidlaw, 528 U.S. at 189, 120 S. Ct. at 708. In the context of cases alleging an unconstitutional deprivation of access to (purportedly confidential) criminal justice information, when a plaintiff points to only a single instance of an agency’s withholding a document and later disclosing the same after suit has been filed, the case will generally not fall within the “voluntary cessation” exception to mootness. In such a case, it is not generally reasonable to expect the “same wrong”[9] to recur, such that a ruling on the merits would be of any discernible future benefit to the litigants or the interests of judicial economy. Exceptions to the mootness doctrine allow courts to rule on non-extant controversies in order to provide guidance concerning the legality of expected future conduct. Yet, in light of the literally infinite assemblage of variables that could arise in a future dispute (and prove determinative of its outcome), final judicial disposition of the tripartite test for balancing the competing constitutional interests will provide *349 limited meaningful guidance, if any, to the conduct of hypothetical future parties.
¶39 If however, a plaintiff could show that the same agency has repeatedly withheld documents (or information contained within documents) from public disclosure and then fully disclosed those same documents upon the plaintiffs filing suit to enforce its right to know, the agency would shoulder a very hefty burden in attempting to persuade this Court that the “challenged conduct cannot reasonably be expected to [recur]" Laidlaw, 528 U.S. at 189, 120 S. Ct. at 708. In such a situation, the agency’s conduct violates at least one constitutional right and becomes transparently manipulative, or perhaps merely evinces apparent genuine confusion over the legality of public dissemination in certain contexts. Thus, it becomes reasonable to expect that if a substantially similar situation occurs, the agency will repeat the obstructive tactics that the plaintiff challenges, perpetrating a substantially similar, though not identical, wrong. In such cases, final judicial adjudication may provide useful guidance that may obviate future violations of the right to know. Accordingly, a plaintiff may likely obtain adjudication of such past disputes under the “voluntary cessation” exception to mootness.
¶40 Havre has provided the Havre Daily News with a complete copy of both Reports. The Newspaper alleges no other past instances of the Havre Police Department’s unconstitutionally depriving it of access to documents or portions thereof. Nor does it point to inevitable future violations of the right to know in anything other than conjectural, conclusory fashion. Thus, the identical wrong is incapable of recurrence, and the Newspaper points to no concrete evidence suggesting that Havre will perpetrate a substantially similar wrong. Consequently, Havre has conclusively established that “the challenged conduct’-redacting portions of these particular Reports-“cannot reasonably be expected to [resume].”[10] Laidlaw, 528 U.S. at 189, 120 S. Ct. at 708. Any hypothetical refusal to provide access to such reports in the future would not constitute a recurrence of the same challenged conduct because we must “balance the competing constitutional interests” at issue under the unique “facts of each case,” Missoulian, 207 Mont. at 529, 675 P.2d at 971. To the extent that this case once presented a justiciable controversy, that dispute has been rendered *350 moot by Havre’s providing the Havre Daily News with a complete copy of the Reports.
¶41 Rather than granting summary judgment in favor of Havre, thereby indicating that Havre is entitled to prevail on the merits as a matter of law, the District Court should have dismissed this unripe, moot, and therefore non-justiciable controversy without prejudice. See Parker v. Weed, 220 Mont. 49, 51, 713 P.2d 535, 537 (1986) (reversing a district court’s award of summary judgment to a defendant, and indicating that the court properly disposes of a non-justiciable controversy by dismissing the case without prejudice). Consequently, this case is remanded to the District Court with instructions to dismiss the Newspaper’s claims without prejudice.

Issue 3: Whether the District Court erred in determining that the Newspaper may recover attorney fees incurred prior to receiving the unredacted Reports.

¶42 The Newspaper contests the District Court’s award of attorney fees. The Newspaper contends that it brought this action to enforce its constitutional right to know, so the court should have awarded the Newspaper all fees incurred in this action, including fees incurred on appeal. The Newspaper insists that its failure to file an affidavit on attorney fees is of no consequence. Instead of filing an affidavit based on the District Court’s limited award of fees, the Newspaper appealed the award and requested a broader award of attorney fees. Presumably, the Newspaper expects that once this Court has resolved the dispute over its entitlement to fees, it can then introduce evidence as to the appropriate amount of attorney fees.
¶43 Havre contests both the Newspaper’s entitlement to attorney fees as a matter of law and the lack of any evidentiary basis for awarding a specific amount of fees. Havre argues that the Newspaper did not prevail in the District Court, so it cannot recover attorney fees pursuant to § 2-3-221, MCA. Havre contends that the Newspaper did not bring this action to enforce its constitutional right to know, because Winderl had already viewed a complete copy of the Reports before receiving the redacted versions. Havre suggests that the public has not benefited from the Newspaper’s efforts, so no justification exists for spreading litigation costs to the taxpayers. Finally, Havre maintains that by failing to file either a court ordered fee affidavit before filing an appeal or a motion under M. R. Civ. P. 59(g) to alter or amend the judgment within ten days of receiving notice of entry of judgment, the Newspaper effectively waived its right to recover attorney fees.
¶44 Section 2-3-221, MCA, provides that “[a] plaintiff who prevails in an action brought in district court to enforce his rights under Article *351 II, section 9, of the Montana constitution may be awarded his costs and reasonable attorneys’ fees.” A district court exercises discretion in awarding fees under this section. Bozeman Daily Chronicle, 260 Mont. at 230, 859 P.2d at 442. Although Havre correctly observes that the Newspaper did not technically “prevail” in its action in the District Court, the court granted summary judgment in favor of Havre precisely because Havre mooted the case by providing the Newspaper with unredacted copies of the Reports. Absent Havre’s conduct, the case would not have become moot. In mooting the case, Havre provided the Newspaper with the very relief it sought to procure through litigation; thus, the Newspaper has prevailed in substance, albeit without court intervention. Given these circumstances, we will consider the Newspaper to be the prevailing party with respect to its request for unredacted copies of the Reports. Otherwise, a similarly situated party could, after extensive litigation, at the eleventh hour, and facing imminent defeat, simply moot a case in order to dodge this fee-shifting statute. Because its unripe request for prospective relief was never justiciable, the Newspaper is not the prevailing party with respect to those claims.
¶45 Havre speciously argues (based on Winderl’s momentary viewing of the unedited Reports) that the Newspaper did not bring this cause of action to enforce its constitutional right to know, and that the public derived no benefit from the Havre Daily News’s obtaining unredacted copies of the Reports. By its terms, the right to know is not constrained by time nor by whether a person has already once examined a document. See Mont. Const, art. II, § 9. Deprivation of access to a document is no less a violation of the right to know simply because temporary access was once granted. A government does not achieve transparency and accountability-the ostensible purposes behind the constitutional right to know-by allowing citizens only a fleeting glance at documents. Faced with the prospect of lawsuits for libel and slander, the media cannot effectively hold the government publicly accountable if afforded the opportunity to view but temporarily the evidence on which its stories rely, but denied the opportunity to actually procure and preserve that same evidence.
¶46 Finally, Havre’s argument that the Newspaper waived its right to recover attorney fees by failing to provide the court with evidence of the proper amount of fees also lacks merit. The District Court ordered the Newspaper’s counsel to file an affidavit of attorney fees. The court imposed no deadline for counsel’s fifing this affidavit. We have repeatedly affirmed a party’s legal entitlement to recover attorney fees and remanded for a proper evidentiary determination of the *352 recoverable amount of attorney fees. See, e.g., Plath v. Schonrock, 2003 MT 21, ¶ 41, 314 Mont. 101, ¶ 41, 64 P.3d 984, ¶ 41. Thus, the failure to file an affidavit of attorney fees prior to pursuing this appeal is not fatal to the Newspaper’s entitlement to recover fees. Furthermore, Havre incorrectly suggests that the Newspaper’s failure to file a motion to alter the verdict pursuant to M. R. Civ. P. 59(g) undermines its right to recover fees. The District Court’s determination that the Newspaper is legally entitled to recover fees renders M. R. Civ. P. 59(g) irrelevant. See Chase v. Bearpaw Ranch Ass’n, 2006 MT 67, ¶¶ 18-23, 331 Mont. 421, ¶¶ 18-23, 133 P.3d 190, ¶¶ 18-23 (holding that a court has rendered its decision on a Rule 59(g) motion for attorney fees when it awards fees, albeit without specifying an amount).
¶47 Judicial economy would be promoted if the Newspaper had procured a definite fee award before appealing. The Newspaper, however, used this appeal in order to assert its broad legal entitlement to attorney fees. On this legal question, which is ripe for review, we largely concur with the District Court’s determination. Havre cross-appealed, asserting that the Newspaper waived its right to recover the fees actually awarded by the court. Because the corut has not yet awarded fees in any specific amount, Havre has essentially asked us to review an action that the District Court has not yet taken. Thus, Havre’s cross-appeal is not ripe for review. See Langemo v. Montana Rail Link, Inc., 2001 MT 273, ¶ 34, 307 Mont. 293, ¶ 34, 38 P.3d 782, ¶ 34 (holding that an issue is not ripe for review absent a conclusive ruling by the district corut).
¶48 The District Court properly determined that the Newspaper may recover those attorney fees incurred in securing the unredacted Reports. Any attorney fees incurred after that time are not recoverable. We affirm and remand for the District Court to hold an evidentiary hearing to ascertain the amount of legal fees incurred by the Newspaper in order to obtain the unredacted Reports prior to its receipt of those Reports. Any fees incurred prior to that time in an attempt to obtain prospective relief may not be recovered by the Newspaper.
CHIEF JUSTICE GRAY, JUSTICES WARNER, MORRIS and RICE concur.

 On appeal, the Newspaper has presented no argument pertaining to its request for a policy requiring dissemination of copies at no more than the actual cost of reproduction-not even a simple allegation that a charge of three dollars infringes the constitutional right to know, let alone an articulation of how or why such a charge might violate the constitution. Consequently, we deem this issue waived for purposes of this appeal.

 After this case was filed, the Department of Justice promulgated administrative rules that define “initial offense report” and delineate the contents thereof. See Admin. R. M. 23.12.201 and 23.12.203 (effective August 20, 2004). In light of the fact that these rules have been promulgated, the Newspaper’s request for judicial re-determination of the required contents of initial incident reports amounts to a request that this Court usurp the rule-making authority of the Department of Justice, see, § 44-5-105, MCA, and effectively declare Admin. R. M. 23.12.203 unconstitutional.

 The Reports are actually labeled as an “Incident Report” and an accompanying ‘Narrative for Sergeant Paul S. Huston.” Assuming that these are properly treated as initial arrest reports, initial incident reports, or one of each, definitional ambiguity persists. Such ambiguity stems from the legislative classification of “criminal investigative information” as confidential criminal justice information, § 44-5-103(3)(a), MCA. “Criminal investigative information,” in turn, is defined as “information associated with an individual... or event compiled by a criminal justice agency in the course of conducting an investigation of a crime or crimes. It includes information about a crime or crimes derived from reports of informants or investigators or from any type of surveillance.” Section 44-5-103(6)(a), MCA.
Sergeant Huston’s ‘Narrative” describes his investigation of a report of an underage drinking party. The “Narrative” details his initial surveillance of the area, his apprehension of a fleeing suspect, his procurement of physical evidence of the party (empty, partially full, and unopened beer cans), and his initial interviews of suspects and uncharged witnesses. In so far as the ‘Narrative” contains information gathered by Sergeant Huston “in the course of conducting an investigation” into the reported crimes (including interviews with witnesses) and his preliminary surveillance of the *340 scene, it constitutes “criminal investigative information,” § 44-5-103(6)(a), MCA, and therefore qualifies as “confidential criminal justice information,” § 44-5-103(3)(a), MCA. Assuming, as does the Newspaper (sans explanation), that this ‘Narrative” also qualifies as an initial offense (or arrest) report, the legislature has paradoxically classified it as both public criminal justice information and confidential criminal justice information.

 Of course, long before a dispute reaches the courts, somebody (or perhaps a committee) within the government agency would have already made each of these three determinations before deciding to withhold information in order to protect the right of privacy.

 In addition, the dissent overlooks the fact that, according to the sole factual allegation in the Newspaper’s complaint that does not deal exclusively with the Reports, Havre apparently does have a policy for handling requests for dissemination of such reports: such requests are not, as the dissent suggests, denied, but are referred to Officer Bartel. The Newspaper simply disapproves of this informal policy, and so has asked the courts to rewrite it, under the auspices of the Constitution.

 We deem the Newspaper’s claims pertaining to Winderl’s request for the Reports moot, see below ¶¶ 28-40. Consequently, the Newspaper’s request for prospective relief, distilled to its essence, constitutes a challenge to the constitutionality of § 44-5-105, MCA (granting the Department of Justice rulemaking authority with respect to criminal justice information), as well as a challenge to the constitutionality of a rule promulgated thereunder, specifically Admin. R. M. 23.12.203. The Newspaper may mount such a direct challenge in another proceeding, pursuant to § 2-4-702, MCA. *344 Disconnected from any factual basis, however, the Newspaper’s present attempt to collaterally challenge the rule fails for want of ripeness both for the reasons enumerated above and due to the absence of any administrative record that might provide a court with some factual bases to guide the effort to balance the conflicting constitutional rights at issue.

 The concern is that a defendant will attempt to moot only a plaintiffs meritorious claims, thereby avoiding an undesirable judgment on the merits while vigorously contesting those cases in which he expects to prevail. See U.S. v. W.T. Grant, 345 U.S. 629, 632-33, 73 S. Ct. 894, 897 (1953). This concern is particularly acute in situations when one would expect the same defendant to encounter substantially identical future controversies.

 In both Heisler and Montana-Dakota Util., we found that the cases were not moot because the plaintiffs had demonstrated a “reasonable expectation that [they] would be subject to the same action again.” Montana-Dakota Util., ¶ 7; Heisler, 282 Mont. at 276, 937 P.2d at 48. Thus, the defendants could not possibly have established that the challenged conduct could not reasonably be expected to recur, as necessary to render the case moot under the “voluntary cessation” exception.

 The same wrong, at a high level of abstraction (i.e., deprivation of access to documents containing criminal justice information that should be publicly disseminated, notwithstanding the right of privacy), will predictably recur. As illustrated above, see ¶¶ 21-23, however, in determining whether the criminal justice agency has perpetrated a “wrong,” we engage in a fact-specific three-part balancing test. Viewed through this lens, improper deprivations of access to criminal justice documents are not at all interchangeable. Rather, the unique facts of each case dictate the ultimate outcome, resulting in distinctive dispositions. The resolution of a dispute will generally provide only limited guidance in resolving a narrow class of potential future disputes. Accordingly, in this context, in considering whether the “same wrong” will recur, courts should conceive of the wrong in concrete terms, rather than in the abstract. Thus, whether a deprivation constitutes the “same wrong” depends on whether the substantially identical constellation of facts-facts which breathe life into and shape the conflicting constitutional rights-will recur.

 The outcome here would not differ if we were to apply the exception for wrongs “capable of repetition, yet evading review,” because the Newspaper cannot establish a reasonable expectation that it will be subjected to the same action again.