JUSTICE RICE,
dissenting.
¶55 I believe the Court has adopted a deeply flawed test for application of the submission requirement of Article XIV, Section 11, of the Montana Constitution, which is not rooted in the text of the Constitution. The effect of this decision may be to significantly undermine, if not eliminate, the right of Montanans to amend the Constitution by initiative. This is not merely my opinion, but the experience of other courts. Respectfully, I believe the Court has failed to “apply the separate-vote requirement in a manner that does not encumber the right of the people to amend the Constitution.” Opinion, ¶ 25.
¶56 Before discussing these concerns, I begin with the threshold concern that the Court has, in my view, violated justiciability principles by exercising original jurisdiction of this constitutional challenge. The judicial power of Montana’s courts is limited to “justiciable controversies.” Reichert v. State, 2012 MT 111, ¶ 53, 365 Mont. 92, 278 P.3d 455. This constitutional limitation, deriving from Article VII, Section 4(1) of the Montana Constitution, “embodies the same limitations as are imposed on federal courts by the ‘case or controversy’ language of Article III” of the United States Constitution. Mont. Immigrant Justice Alliance v. Bullock, 2016 MT 104, ¶ 18, 383 Mont. 318, 371 P.3d 430 (citing Plan Helena, Inc. v. Helena Reg’l Airport Auth. Bd., 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 567). Among the central components of justiciability is the doctrine of ripeness, which is concerned with whether the case presents an “actual, present” controversy. Reichert, ¶ 54 (citing Mont. Power Co. v. Mont. Pub. Serv. Commn., 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91). The “prudential component” of the ripeness doctrine includes a fitness inquiry. Reichert, ¶ 56. “The principal consideration under the fitness inquiry is whether there is a factually adequate record upon which to base effective review.” Reichert, ¶ 56 (citing Havre Daily News, LLC v. City of Havre, 2006 MT 215, ¶ 20, 333 Mont. 331, 142 P.3d 864). “The more the question presented is purely one of law, and the less that additional facts will aid the court in its inquiry, the more likely the issue is to be ripe, and vice-versa.” Reichert, ¶ 56 (citing Havre Daily News, ¶ 20).
¶57 Similarly, the doctrine of judicial restraint cautions against the premature exercise of judicial authority. “Neither federal nor state Constitution has granted such power” to decide “abstract differences *207 of opinion,” but rather cases and controversies must be “real controversies.” Hardy v. Krutzfeldt, 206 Mont. 521, 526, 672 P.2d 274, 276 (1983) (citing Chovanak v. Matthews, 120 Mont. 520, 525-26, 188 P.2d 582, 584 (1948)). “We have followed this same principle of judicial restraint” under our new Constitution, as under the former Constitution. Roosevelt v. Mont. Dep’t of Revenue, 1999 MT 30, ¶ 48, 293 Mont. 240, 975 P.2d 295 (citing Olson v. Dep’t of Revenue, 223 Mont. 464, 469-70, 726 P.2d 1162, 1166 (1986)). Especially when a “constitutional violation is claimed to have occurred,” the plaintiff must allege “such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens presentation of issues...." Baker v. Carr, 369 U.S. 186, 204, 82 S. Ct. 691, 703, 7 L. Ed. 2d 663, 678 (1962). We have explained that:
This Court... has no jurisdiction to pronounce any statute, either of a state or of the United States, void, because irreconcilable with the constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered: one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.
Roosevelt, ¶ 49 (citing United States v. Raines, 362 U.S. 17, 21-22, 80 S. Ct. 519, 522-23, 4 L. Ed. 2d 524, 529-30 (1960) (emphasis added).
¶58 Beyond fitness and judicial restraint principles, this Court is to exercise original jurisdiction over a declaratory judgment matter only when constitutional issues of statewide importance are involved, urgency and emergency factors exist making the normal appeal process inadequate, and “the case involves purely legal questions of statutory and constitutional construction.” Hernandez v. Bd. of Cnty. Comm’rs, 2008 MT 251, ¶ 9, 345 Mont. 1, 189 P.3d 638 (citing Montanans for the Coal Trust v. State, 2000 MT 13, ¶ 27, 298 Mont. 69, 996 P.2d 856) (emphasis added); see also M. R. Civ. P. 14(4); Mont. Const. art. VII, §§ 1-2.
¶59 Consequently, the requisite questions are 1) whether there is concrete adverseness and not an “abstract difference of opinion,” 2) whether we are faced with purely legal questions of constitutional construction, and 3) whether there is a factually adequate record for effective review. However, the task of answering these questions in this case has been complicated by the Court’s adoption, discussed below, of a complicated constitutional test requiring multiple determinations to *208 be made for its application. While the issue as framed by the Court sounds in procedure—whether there was error “in the submission of [CI-116] to the voters of Montana,” Opinion, ¶ 51,—in reality, the test requires the Court to analyze the substantive content and effect of the initiative, which, in turn, makes a factual record even more critical.
¶60 Here, as the Court notes, CI-116 has not yet been implemented. With no information about its implementation, Petitioners have theorized about its application to allege their injury. See Petitioners’ briefing (petitioner MACo members will be required to “seek tax increases, etc.” and “to hire victim-support staff and additional attorneys;” petitioner county attorney will be injured “via raised taxes or fees, or fewer services;” petitioner lawyer’s “ability to serve her [victim] clients will be injured by diminished funding for victim-services”). Petitioner Association of Criminal Defense Attorneys alleges simply that the rights of its members’ clients to “traditional” due process protections “will be diminished.” Petitioner ACLU of Montana Foundation alleges in like fashion that “some [of its members] will in the future be accused of a crime and be injured by application of Section 36.” However, no factfinding whatsoever has occurred to confirm any of these assertions, and they are, at this stage, merely “abstract differences of opinion” regarding the impact of the implementation of CI-116, dependent upon how a court interprets and applies its provisions to particular circumstances. Hardy, 206 Mont. at 526, 672 P.2d at 276.
¶61 The Court states that “the question of whether CI-116 violates the Montana Constitution involves purely legal questions of constitutional interpretation,” Opinion, ¶ 2, but Petitioners’ untethered allegations and absence of a record force the Court to make factual assumptions, such as its vague findings that CI-116 “changes a prosecutor’s duties” and will “add steps” to criminal proceedings. Opinion, ¶¶ 36, 41. This problem is notable within the Court’s analysis of the right to privacy in Issue If. Lacking a factual record of an actual privacy claim by a victim, the Court makes the assumption that any such claim would “substantively change I [” Article II, Sections 9 and 10, and fails to recognize that the privacy interest created by CI-116 is textually much different. Opinion, ¶ 48. Article II, Section 10 provides a broad-based privacy right to every individual, potentially applicable to any number of circumstances, as “essential to the well-being of a free society.” In contrast, the text of CI-116 recognizes a more limited right of privacy applicable to crime victims during a criminal proceeding. The right granted under CI-116 may well lead to claims that are narrower in scope and warrant a narrower remedy, which may be possible to *209 harmonize with the Article II privacy right, as is our duty. Indeed, other jurisdictions have determined that victim rights of privacy do not create an absolute right, but rather a flexible right allowing courts to weigh the circumstances of each case. See e.g. State v. Gonzalez, 912 P.2d 297, 300 (N.M. Ct. App. 1996) (rejecting argument that victims’ rights amendment created an “absolute” privilege against inspection of victim’s medical records by the trial court or subsequent disclosure to other parties); State of Maryland v. WBAL-TV, 975 A.2d 909, 922-23 (Md. Ct. App. 2009) (victims’ right amendment “does not ... provide victims with an absolute right to veto a request to access and copy court records”).
¶62 Similarly, the problem is notable in the Court’s application of a prosecutor’s duties in issue 1(b). The Court acknowledges that the text of CI-116(1)(j) gives a victim only a right to “confer with the prosecuting attorney,” a limited right that is already common practice. Opinion, ¶ 35. Lacking a factual record, the Court must assume how the provision will be applied, and concludes that a victim’s right to confer with a prosecutor will “changel I the way a prosecutor must handle a criminal case.” Opinion, ¶ 36. The court first reasons that a prosecutor “must obey the Montana Rules of Professional Conduct” which prohibit “prosecuting a charge that the prosecutor knows is not supported by probable cause.” Opinion, ¶ 34. Then, the Court assumes that prosecutors will interpret a victim’s right to “confer with the prosecuting attorney” as tantamount to giving the victim the power to force prosecutions, in turn forcing the prosecutor to pursue a case that is “not supported by probable cause[,]” and will thus affect our ability to make rules governing attorney conduct. Opinion, ¶ 34-36. These assumptions stray from the limited right for a victim to meet with a prosecutor, which may be possible to harmonize with existing constitutional provisions. At this point, we do not know how the new constitutional interests will be raised and what remedy will be claimed. The Court is basing its constitutional ruling upon its deduction about how the provisions will be interpreted and applied.
¶63 As we stated earlier in this case, “we use the same rules of construction to interpret constitutional initiatives that we use to interpret statutes.” Mont. Cnty. Attys. Ass’n v. State, 387 Mont. 534, *2 (citation omitted). “Where there are several statutory provisions or particulars, the Court construes them, if possible, to give effect to all. Section 1-2-101, MCA.” Olson v. Daughenbaugh, 2001 MT 284, ¶ 16, 307 Mont. 371, 38 P.3d 154. Likewise, we are to interpret provisions “in a manner that gives effect to the legislature’s intent if possible.” Weidow v. Uninsured Employers’ Fund, 2010 MT 292, ¶ 22, 359 Mont. *210 77, 246 P.3d 704. However, we cannot now know if our interpretational duty to harmonize these constitutional provisions is possible to fulfill. Without a specific claim and a factual record, it is impossible to properly determine whether a constitutional conflict exists that cannot be reconciled.
¶64 This is likewise true of the other constitutional conflicts that the Court perceives in CI-116. Without a factual record, the Court cannot determine whether it is possible to balance competing constitutional interests, a duty we are often compelled to perform. See Galt v. State, 225 Mont. 142, 148, 731 P.2d 912, 916 (1987) (balancing the constitutional interests of private landowners under Article IX, Section 7 and Article II, Section 3 with the public’s property interest in water under Article IX, Section 3); Krakauer v. State, 2016 MT 230, ¶ 36, 384 Mont. 527, 381 P.3d 524 (competing constitutional interests should be addressed in a case-by-case basis and according to the facts of each case). How particular constitutional rights will be weighed and balanced with other such rights is a matter that can only be decided in the factual context of an actual, concrete legal dispute.
¶65 Because “additional facts [would] aid the court in its inquiry,” Reichert, ¶ 56, and decisively so, I would conclude that the petition fails to present a ripe issue, that we are not faced with purely legal questions of constitutional interpretation, and that the factual record is inadequate for effective review. While the Court offers that “normal litigation and appeal processes are inadequate because implementation of CI-116 is imminent,” Opinion, ¶ 2, this provides no basis under our precedent to exercise original jurisdiction. All enacted laws become imminently enforceable.
¶66 While I could stop at this point, my deep concerns about the Court’s new test for application of the separate-vote requirement of Article XIV, Section 11, lead me to discuss the merits of the Court’s constitutional analysis. In Marshall v. State, 1999 MT 33, 293 Mont. 274, 975 P.2d 325, this Court invalidated CI-75 for violating the separate vote requirement of Article XIV, Section 11. We first found that “CI-75 specifically amends three parts of Montana’s Constitution.” Marshall, ¶ 24. The Court determined that the text of CI-75 expressly amended Article VIII, Article II, Section 18, and Article VI, Section 10, of the Constitution. Marshall, ¶ 24. Then, the Court concluded “lblecause CI-75 expressly amends three parts of Montana’s Constitution but does not allow a separate vote for each amendment, we hold that CI-75 violates Article XIV, Section 11, of Montana’s Constitution.” Marshall, ¶ 24.
¶67 The Court in Marshall was guided by the Oregon Supreme Court’s *211 decision in Armatta v. Kitzhaber, 959 P.2d 49 (Or. 1998). Although acknowledging that the Montana Constitution differs from the Oregon Constitution, Opinion, ¶ 22, the Court today more fully incorporates principles from Armatta, which, in my opinion, do not correspond to the Montana Constitution. The Court also adds additional requirements of its own to formulate a new test. The Court holds:
[T]he proper inquiry is whether, if adopted, the proposal would make two or more changes to the constitution that are substantive and not closely related. Moreover, if a proposed constitutional amendment adds new language to the constitution, that proposition is at least one change in and of itself. Then ‘if a measure has the effect of modifying an existing constitutional provision, it proposes at least one additional change to the constitution, whether that effect is explicit or implicit.’
Opinion, ¶ 28, (citations omitted).
¶68 Then, the Court adopts further holdings from the Armatta line of authority to instruct its “closely related” component:
First, we examine the relationship among the constitutional provisions that the measure affects, both explicitly and implicitly. If the affected provisions of the existing constitution themselves are not related, then it is likely that changes to those provisions will offend the separate-vote requirement...

Next, we must consider the constitutional changes themselves. That is, assuming that the constitutional provisions affected by the measure are closely related, we must determine whether the changes made to those related constitutional provisions are closely related. If they are closely related, the measure under consideration survives scrutiny under [the separate-vote requirement]. If they are not, it does not.
Opinion, ¶ 29.
¶69 Thus, under the Court’s new test, if a constitutional initiative adds new language to the constitution, “that proposition is at least one change in and of itself.” Opinion, ¶ 28. Then, if the initiative “has the effect of modifying” an existing constitutional provision in a way that is deemed “unrelated” to the new text, whether such modification is express or implied, then such an “effect” must also be counted as “one additional change to the constitution,” requiring a separate vote. Opinion, ¶ 28. Applying the new test here, the Court concludes that CI-116 is invalid in seven different ways, reasoning that the initiative “affects” seven different existing provisions of the Montana Constitution, each of which required a separate vote, in addition to the *212 vote taken on the text of CI-116 itself, for a total of eight votes. Opinion, ¶¶ 31-49.
¶70 This new formula, whereby a textual “proposition” is counted as “one change in and of itself,” while the measure’s “effect” upon an existing constitutional provision is counted as a second change, Opinion, ¶ 28, is inconsistent with the language of Article XIV, Section 11, which is premised upon the concept of “amendments,” not “propositions” and “effects.” The distinction is illustrated by the Court’s analysis of the right to privacy.
¶71 CI-116 provides that crime victims have the right “to privacy, including the right to refuse an interview, deposition or other discovery request and to set reasonable conditions on the conduct of any interaction to which the victim consents.” CI-116(1)(f). Applying its new test to this clause, the Court first reasons that CI-116 “providfes] a new constitutional right to ... crime victims” which is a “change in itselfl.]” Opinion, ¶ 48. Then the Court reasons that this new clause also “substantively change Is I” Article II, Section 9, the public’s right to know, and Section 10, an individual’s right to privacy, which requires a separate vote because of how it “affect! s I” the two constitutional provisions, thus concluding that the clause must receive a separate vote for its adoption. Opinion, ¶ 48. However, what has been lost in the application of the test’s components is that the two concepts identified by the Court are two sides of the same amendment coin: one side is the new text, while the other side is the effect of the new text. Article XIV, Section 11, does not require separate votes for text and effect, but for wholly separate amendments, and we should analyze the issue in that way—as we did in Marshall.
¶72 To be clear, I agree with the Court that a constitutional initiative could have the effect of amending one or more articles of the Constitution even though the initiative’s text does not expressly identify or add new language to the amended articles. Thus, I concur with the Court’s assessment that in Marshall, n.2, we left open the possibility that such an initiative could run afoul of Article XIV, Section 11. Opinion, ¶ 24.[1] My disagreement lies in the test adopted by the Courtfor identifying these separate amendments. As recognized by other courts, the Court’s test is problematic because it will lead to the invalidation of challenged constitutional initiatives that do not actually effectuate multiple amendments, severely undermining citizen rights.
*213 ¶73 The Armatta approach—that is, adoption of “an exacting functional relationship test” for application of a constitutional separate-vote requirement, as the Court does here by way of its “closely-related” requirement, Opinion, ¶¶ 28-29—has been recognized as the “minority rule” among the states, and was once thought dormant. Californians for an Open Primary v. McPherson, 134 P.3d 299, 322 (Cal. 2006) (explaining that the Armatta approach was “an essentially dormant minority position until the Supreme Court of Oregon—without citing any of them or acknowledging the majority rule cases discussed above—revived this strict interpretation of the separate-vote provision in 1998.”). While courts must faithfully interpret their own unique constitutions, the majority and minority positions on this issue have been acknowledged in case law and scholarship, wherein it is recognized that “it is clear” the full Armatta approach “is indeed a demanding one” that leads to the predictable conclusion that “most proposed constitutional amendments will fail” under its application. McPherson, 134 P.3d at 322-23 (“Indeed, in the few other jurisdictions that recently have embraced (explicitly or implicitly) Armatta’s interpretation of the separate-vote provision under their own constitutions, the results have, with one exception, been consistent with the recent Oregon experience” of striking down challenged initiatives.). Commentary has noted the difficulty in drafting an initiative that can survive application of the Armatta test. See Phillip Bentley, Armatta v. Kitzhaber: A New Test Safeguarding the Oregon Constitution from Amendment by Initiative, 78 Or. L. Rev. 1139, 1154-56 (1999).
¶74 This precipitous invalidation of initiatives likely will occur under the Court’s analysis here. I note again the Court’s analysis of CI-116’s right to privacy provision. If CI-116, in its entirety, would have provided only that victims have a right “to privacy, including the right to refuse an interview, deposition, or other discovery request and to set reasonable conditions on the conduct of any interaction to which the victim consents,” see CI-116(1)(f), and said nothing else, it would nonetheless still violate the separate-vote requirement under the Court’s test, and be invalid. This is because it adds a new section to the Constitution—requiring one vote—and also constitutes an “unrelated” implied change to the existing privacy provision—requiring a second vote. See Opinion, ¶¶ 31-49. Few initiatives will survive the *214 microscopic judicial review created herein.[2]
¶75 Instead, we should use the test that is consistent with the language of Article XIV, Section 11, our constitutional history,[3] and our case law. In Marshall, while taking “guidance” from Armatta, we did not adopt that holding wholesale. Rather, we employed an analysis founded upon our own Constitution, which is premised on whole “amendments.” We made a straight-forward determination that the text of CI-75 amended the Constitution in three ways—without regard to the numerous concepts employed here by the Court. Marshall, ¶ 24. The same approach can be used for initiatives that amend the Constitution without the use of explicit language—as the Court *215 suggested in footnote #2. The question is, does the initiative substantively constitute more than one amendment? Such an approach would not invalidate an initiative merely because it contained text that changed or revised more than one article of the Constitution, as long as those revisions were part of one complete, substantive amendment. Further, this straight-forward, constitutionally-based approach would avoid the flawed formulaic approach of assessing the text and the effect separately.
¶76 Most importantly, so holding would affirm the promise of Article II, Section 2, of the Montana Constitution, whether the courts think it good policy or not:

The people have the exclusive right of governing themselves as a free, sovereign, and independent state. They may alter or abolish the constitution and form of government whenever they deem it necessary.

¶77 I dissent.
JUSTICE BAKER joins in the dissenting Opinion of JUSTICE RICE.
Appendix A
Constitutional Initiative 116
(1) To preserve and protect a crime victim’s right to justice, to ensure a crime victim has a meaningful role in criminal and juvenile justice systems, and to ensure that a crime victim’s rights and interests are respected and protected by law in a manner no less vigorous than the protections afforded to a criminal defendant and a delinquent youth, a crime victim has the following rights, beginning at the time of victimization:
(a) to due process and to be treated with fairness and respect for the victim’s dignity;
(b) to be free from intimidation, harassment, and abuse;
(c) to be reasonably protected from the accused and any person acting on the accused’s behalf;
(d) to have the victim’s safety and welfare considered when setting bail and making release decisions;
(e) to prevent the disclosure of information that could be used to locate or harass the victim or that contains confidential or privileged information about the victim;
(f) to privacy, including the right to refuse an interview, deposition, or other discovery request and to set reasonable conditions on the conduct of any interaction to which the victim consents;
*216 (g) to receive reasonable, accurate, and timely notice of and to be present at all proceedings involving the criminal conduct, plea, sentencing, adjudication, disposition, release, or escape of the defendant or youth accused of delinquency and any proceeding implicating the rights of the victim;
(h) to be promptly notified of any release or escape of the accused;
(i) to be heard in any proceeding involving the release, plea, sentencing, disposition, adjudication, or parole of the defendant or youth accused of delinquency and any proceeding implicating the rights of the victim;
(j) to confer with the prosecuting attorney;
(k) to provide information regarding the impact the offender’s conduct had on the victim for inclusion in the presentence or predisposition investigation report and to have the information considered in any sentencing or disposition recommendations submitted to the court;
(l) to receive a copy of any presentence report and any other report or record relevant to the exercise of a right of the victim, except for those portions made confidential by law;
(m) to the prompt return of the victim’s property when no longer needed as evidence in the case;
(n) to full and timely restitution. All money and property collected from a person who has been ordered to make restitution must be applied first to the restitution owed to the victim before paying any amounts owed to the government.
(o) to proceedings free from unreasonable delay and to a prompt and final conclusion of the case and any related postjudgment proceedings;
(p) to be informed of the conviction, sentence, adjudication, place and time of incarceration, or other disposition of the offender, including any scheduled release date, actual release date, or escape;
(q) to be informed of clemency and expungement procedures; to provide information to the Governor, the court, any clemency board, or any other authority and to have that information considered before a decision is made; and to be notified of any decision before the release of the offender; and
(r) to be informed of the above rights and to be informed that the victim may seek the advice and assistance of an attorney with respect to the above rights. This information must be made available to the general public and provided to all crime victims on what is referred to as a Marsy’s card.
*217 (2) A victim, the victim’s attorney, the victim’s legal representative, or the prosecuting attorney at the request of the victim may assert and seek enforcement of the rights enumerated in this section and any other right afforded to the victim by law in any trial or appellate court or any other authority with jurisdiction over the case as a matter of right. The court or other authority shall act promptly on the request, affording a remedy by due course of law for the violation of any right. The reasons for any decision regarding disposition of a victim’s right must be clearly stated on the record.
(3) This section may not be construed to deny or disparage other rights possessed by victims. This section applies to criminal and youth court proceedings, is self-executing, and requires no further action by the Legislature.
(4) As used in this section, the following definitions apply:
(a) “Crime” means an act defined as a felony, misdemeanor, or delinquency under state law.
(b) “Victim” means a person who suffers direct or threated physical, psychological, or financial harm as a result of the commission or attempted commission of a crime.
(i) The term includes:
(A) a spouse, parent, grandparent, child, sibling, grandchild, or guardian of the victim;
(B) a person with a relationship to the victim that is substantially similar to a relationship described in subsection (4)(b)(i)(A); and
(C) a representative of a victim who is a minor or who is deceased, incompetent or incapacitated.
(ii) The term does not include the accused or a person who the court believes would not act in the best interests of a minor or of a victim who is deceased, incompetent or incapacitated.
Mont. Const. art II, § 36 (2017), https://perma.cc/VQ76-WRAJ.

 1 also concur with the Court’s statement that the single-subject requirement does not apply to constitutional amendments. Opinion, ¶ 20.

 Similarly, if CI-116, in its entirety, would have provided only that “crime victims have the right to due process and be treated with fairness and respect for the victim’s dignity,” see CI-116(l)(a), and said nothing else, it would nonetheless still violate the separate-vote requirement under the Court’s test, and be invalid. This is because it adds a new section to the Constitution—requiring one vote, and also constitutes an unrelated implicit change to the existing due process provision—requiring a second vote. See Opinion, ¶ 33.

 The Court states that the 1972 Constitution changed the separate-vote requirement because the new constitution allowed amendment by initiative. Opinion, ¶ 19 (concluding “the 1972 Constitution’s amendment by initiative inteijected a new element into the separate-vote requirement....”). However, nothing in the text or history of the separate-vote requirement would support this contention. Rather, the 1972 drafters unanimously adopted the same separate amendment rule from the prior constitution, Mont. Const. Conv. Proc. Vol. I, 354 (1972) (hereafter Committee Report), and made only stylistic changes to the rule. See Mont. Const. Conv. Proc. Vol. IV, 1195 (1972). The Style and Drafting Committee simplified the language to its present form: “If more than one amendment is submitted in the same election, each shall be so prepared and distinguished that it can be voted upon separately.” The language from the 1889 separate-amendment rule read: “Should more amendments than one be submitted at the same election, they shall be so prepared and distinguished by numbers or otherwise that each can be voted upon separately.” Mont. Const. art XIX, § 9 (1889).
The 1969 Legislature appointed a Constitutional Revision Committee, which contemplated how a new constitution might be amended by initiative. The basic purpose of the Committee was to make “a fundamental yet flexible document” for constitutional amendments. Committee Report, at 354. The Committee recognized the importance of constitutional initiatives, recognizing a “further guarantee that the people will retain a firm hold on the power of constituting government.” Committee Report, at 358. The Committee stated that constitutional amendments were “an inherent right in a body politic whose Constitution is to be the embodiment of the will of the people.” Committee Report, at 363. The purpose of allowing popular initiatives was to avoid “cumbersome procedural detail,” which had been a “burden to often-popular Constitutional change,” and to preclude the Supreme Court from voiding proposed amendments because of a “slight procedural irregularity.” Mont. Const. Conv. Proc. Vol. I, 362 (1972).